1

2

3

4

5

6

7

8                            IN THE UNITED STATES DISTRICT COURT

9                           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

12   RICHARD DEAN CLARK,                          No. 97-20618 WHA

13                  Petitioner,                    **ORDER DENYING RENEWED
                                                  MOTION FOR EVIDENTIARY
14       v.                                        HEARING; SUA SPONTE
                                                  RECONSIDERING NECESSITY FOR
15   KEVIN CHAPPELL, Warden of San Quentin         EVIDENTIARY HEARING AS TO
     State Prison,                                 CLAIM 19; AND DENYING PETITION
16                                                 FOR WRIT OF HABEAS CORPUS**
                   Respondent.
17   _____/

18

19          In this pre-AEDPA case, petitioner Richard Dean Clark, a California state prisoner sentenced

20   to death, seeks a writ of habeas corpus under 28 U.S.C. 2254 and an evidentiary hearing under Rule

21   8 of the Rules Governing Section 2254 cases.[1]  For the following reasons, the motion for an

22   evidentiary hearing is **DENIED**; a prior determination that an evidentiary hearing is necessary as to

23   claim 19 is reconsidered *sua sponte*; and the petition for writ of habeas corpus is **DENIED**.

24                                  **FACTUAL BACKGROUND**

25          In the early morning hours of July 19, 1985, fifteen-year old high school student Rosie

26   Grover was raped and murdered in Ukiah.  Rosie had arrived in Ukiah at about 4:00 a.m. on a

27   _____

28   [1] All citations herein to 28 U.S.C. 2254 refer to the pre-AEDPA version of the statute.  *See* 28
     U.S.C. 2254 (1994).

**United States District Court**
For the Northern District of California

1  Greyhound bus and had begun walking home from the bus depot.  Her body was found in a dry
2  creek bed a few hours later.[2]

3         At about 6:15 a.m. on July 19, petitioner entered the Ron-Dee-Voo Restaurant on South
4  State Street in Ukiah, and told waitress Karin Mertle that he had found a girl in a nearby ditch.
5  Petitioner said that the girl was hurt and "maybe raped."  Petitioner was holding a partially empty
6  wine cooler bottle, which he handed to her.  Mertle later gave the bottle to the police.  Officer
7  Wayne McBride of the Ukiah Police Department arrived at the Ron-Dee-Voo Restaurant at 6:34
8  a.m.  He talked to petitioner for thirty to forty minutes, during which time petitioner claimed that he
9  had discovered the girl while taking a shortcut to buy cigarettes at a convenience store on State
10 Street.

11        Rosie's partially clothed body was found in the dry bed of Doolan Creek, which is located
12 near South State Street.  Detectives Fred Kelley and Edward Gall collected physical evidence at the
13 scene.  Rosie's body had stab wounds on the lower abdomen and severe trauma to the head and face.
14 It later was established that Rosie had been raped, stabbed, and bludgeoned to death.  Two bloody
15 concrete blocks, the larger one weighing more than eighteen pounds, were found near the body.  A
16 wine cooler bottle of the same brand and flavor as the one petitioner gave Mertle was found in
17 Rosie's duffle bag, which lay about ten feet from her body.

18        Upon leaving the crime scene, Kelley and Gall went to petitioner's residence at 778 South
19 State Street.  The home belonged to Michelle Stevens, who allowed her paraplegic stepbrother,
20 David Smith, to stay there along with petitioner, who was Smith's caregiver.  Smith gave the
21 officers permission to search Smith's car.  Kelley found a pair of Levi's 501 jeans and a vest on the
22 rear seat, both stained with what appeared to be blood.  Stevens and Smith identified the clothing as
23 that worn by petitioner the prior evening.  Later, a hand-sharpened screwdriver bearing traces of
24 human blood also was found in Smith's car.

25        Kelley and Gall returned to the police station, where petitioner was waiting to speak to them.

26 ─────────────────
27 [2] These facts are taken from *People v. Clark*, 5 Cal. 4th 950 (1993).  Under applicable pre-AEDPA
   law, the California Supreme Court's factual findings are entitled to a presumption of correctness
   absent a showing that one of the statutory exceptions to the presumption applies.  28 U.S.C. 2254(d)
28 (1994); *Thomas v. Chappell*, 678 F.3d 1086, 1101 (9th Cir. 2012).  Petitioner has not made such a
   showing.

Initially, petitioner waived his *Miranda* rights and told the same story he had told McBride at the Ron-Dee-Voo Restaurant earlier that morning.  Later, while being transported to a hospital for a blood test following his arrest and booking, petitioner confessed to Kelley and Gall that he had killed Rosie.  Petitioner claimed that Rosie had consensual sexual intercourse with him but then threatened to accuse him of rape.  Petitioner told Kelley and Gall that he thought he would receive a less severe penalty for killing Rosie than for raping her.  He gave a detailed account of the events leading up to Rosie's death, claiming among other things that Rosie had come on to him by flashing her breast and had given him a wine cooler before having consensual sexual intercourse with him. Petitioner described trying to choke Rosie after she threatened to accuse him of rape, stabbing her with a screwdriver he found in the creek bed, and bashing her head with a piece of concrete. Finally, petitioner admitted that he had gone back to Stevens' State Street residence, changed his clothing in Smith's car, and pretended to find the body in order to deflect suspicion.  Upon returning to the police station, petitioner provided a tape-recorded statement in which gave an account similar to that given in the car, but this time he claimed to have drunk eight or nine beers and used valium, methamphetamine, and marijuana before encountering Rosie.  Petitioner also claimed to have blacked out during the crime.

At trial, the prosecution presented evidence that petitioner spent the afternoon before the murder drinking at a local bar, then smoking marijuana and ingesting cocaine at Stevens' State Street residence.  Petitioner left the State Street residence with Stevens' stepbrother, Dean Michael ("Dino") Stevens, at about 10:00 p.m.  Petitioner and Dino went to Munchie's, a pool hall on State Street, for thirty to forty minutes, then they walked to the home of Dino's friend Robyn Boyd.  Boyd lived near the Greyhound bus depot.  Petitioner and Dino arrived at Boyd's house at about midnight and stayed for ten to thirty minutes, after which they left and parted ways.

The prosecution's experts testified that:  trauma to Rosie's vagina and sperm found inside the vagina indicated that she had been raped; petitioner could not be ruled out as the source of semen found in Rosie's underwear; pubic hair in Rosie's underwear was consistent with a sample provided by petitioner; the blood on the Levi's jeans found in Smith's car was consistent with both Rosie's blood and petitioner's blood; petitioner's shoes were splattered with human blood; a hair

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

found on one of petitioner's shoes was consistent with Rosie's hair and inconsistent with petitioner's hair; the concrete blocks found near the body bore traces of blood consistent with Rosie's blood as well as human head and eyebrow hair; and the sharpened screwdriver found in Smith's car was consistent with stab wounds found on Rosie's body.

Petitioner's trial defense did not include an assertion of innocence. Rather, he argued that his emotional difficulties and drug usage culminated in a "rage reaction" that prevented him from acting with intent when he killed Rosie. He called numerous witnesses to testify to his drug and alcohol usage. He also presented evidence that he was depressed, suicidal, and had a borderline personality disorder. Two experts, Dr. David Smith and Dr. Stephen Raffle, testified about rage reaction.

On rebuttal, the prosecution offered expert testimony that neither petitioner's drug history nor his behavior at the Ron-Dee-Voo Restaurant supported a rage reaction defense.

A jury convicted petitioner of the first-degree murder and rape of Rosie Grover, and found true special circumstances that petitioner committed the murder during the course of the rape, that he inflicted bodily injury with the intent to do so, and that he used a deadly weapon in the commission of the murder.

At the penalty phase, the prosecution relied upon the circumstances of the murder and did not offer additional evidence in aggravation. Petitioner presented the testimony of twenty-three witnesses who were relatives, friends, scoutmasters, a teacher, and a mental health counselor. Cumulatively, the testimony painted a picture of a boy who was well-adjusted until the age of ten, when his parents' separation was followed closely by the deaths of his father and both grandfathers. His mother began drinking heavily and did not provide a good home environment. Petitioner and his younger brother began to drink alcohol and use drugs. Petitioner became depressed and had difficulty in school because he could not read well.

Eventually, petitioner was removed from his mother's custody and placed in foster care, where he did better but continued using alcohol and drugs. While in foster care, petitioner was enrolled in a special education program to address his reading deficiency and emotional problems. He did well in his classes and was popular, but he continued to use drugs during the school day.

4

**United States District Court**
For the Northern District of California

Petitioner was forced to leave the foster home when he graduated from high school.  He lived with a friend for a time and then he went to live with his mother; however, she later moved to Oregon without him.  After that, petitioner met Smith and became his caregiver.  Petitioner injected methamphetamine for the first time about three months before killing Rosie.  Many witnesses expressed disbelief that petitioner could have raped and killed Rosie.  Finally, petitioner continued to attempt to overcome his reading deficiency while awaiting trial.

The jury found death to be the appropriate sentence for petitioner's crimes.  On December 18, 1987, the trial court sentenced petitioner to death.

## PROCEDURAL BACKGROUND

The California Supreme Court affirmed petitioner's conviction on August 30, 1993, *People v. Clark*, 5 Cal. 4th 950 (1993), and it summarily denied his first state habeas petition on November 17, 1993.  The United States Supreme Court denied his petition for writ of certiorari on June 30, 1994.  *Clark v. California*, 512 U.S. 1253 (1994).

### Federal Petition, First Amended Petition, and Second Amended Petition

Petitioner filed a federal habeas petition on April 19, 1995 and a first amended petition on July 15, 1996.  After unexhausted claims were identified, petitioner was granted leave to file a second amended petition omitting the unexhausted claims, and the proceedings were stayed pending exhaustion of state court remedies.  Petitioner filed a second state habeas petition in the California Supreme Court, which was denied summarily on August 13, 1998.

### Third Amended Federal Petition

Petitioner filed a third amended federal habeas petition on October 5, 1998.  Respondent answered on March 22, 1999.  On September 24, 1999, an order issued by Judge James Ware[3] denied respondent's motion to dismiss claims based upon procedural default.  *See* Order Denying Respondent's Motion to Dismiss Claims Based on State Procedural Defaults, Sept. 24, 1999.  A subsequent order granted in part and denied in part respondent's motion to dismiss claims pursuant to *Teague v. Lane*, 498 U.S. 288 (1989); claims 15(a) and 15(f) were dismissed.  *See* Order Granting

---

[3] Judge Ware was assigned to this case for most of the proceedings described herein; the undersigned was not assigned to the case until September 5, 2012.

in Part and Denying in Part Respondent's Motion to Dismiss Claims Based on *Teague* Doctrine, Nov. 19, 1999.

On May 8, 2000, an order issued by Judge Ware granted summary judgment for respondent as to a number of claims. *See* Order Granting in Part and Denying in Part Cross-Motions for Summary Judgment ("May 2000 Order"), May 8, 2000. The May 2000 Order also found an evidentiary hearing to be necessary as to claim 19. May 2000 Order at 36. A subsequent order issued by Judge Ware denied petitioner's motion for leave to seek reconsideration but nonetheless granted petitioner leave to file a motion for an evidentiary hearing addressing claims upon which respondent had prevailed on summary judgment. Order Granting Petitioner Opportunity to Include Claims in Request for an Evidentiary Hearing, June 5, 2000. That order indicated that if petitioner were able to demonstrate the necessity for an evidentiary hearing as to any claim, the May 2000 Order would be amended and an evidentiary hearing would be held as to the subject claim. *Id.* at 2–3.

On July 5, 2000, petitioner filed a motion for an evidentiary hearing. Petitioner's subsequent request for discovery was denied pending disposition of the motion. An order issued rejecting a factual exhaustion defense that respondent had raised in opposition to the motion for an evidentiary hearing. During the same time frame, petitioner filed a third state habeas petition in the California Supreme Court, which was denied on March 30, 2004.

**Fourth Amended Federal Petition**

On April 21, 2004, petitioner filed a fourth amended federal habeas petition. On July 28, 2005, the then-pending motion for an evidentiary hearing was denied without prejudice in light of the amendment to the petition. Respondent filed an answer to the fourth amended petition on January 6, 2006, and petitioner filed a traverse on February 9, 2006. Shortly thereafter, petitioner discovered that some declarations he had submitted to the court may have been falsified. Proceedings were stayed pending investigation by petitioner's counsel. On March 29, 2007, the stay was lifted and petitioner was granted leave to withdraw several exhibits. The parties reported that discovery was ongoing, and filed periodic status reports throughout 2008 and 2009. On July 27, 2009, a scheduling order issued with respect to the filing and briefing of a fifth amended petition

and a motion for discovery.

**Fifth Amended Federal Petition and Motion for an Evidentiary Hearing**

The operative fifth amended federal habeas petition was filed on September 22, 2009, alleging thirty-four claims for relief.  Respondent filed an answer on May 5, 2010, and petitioner filed a traverse on October 5, 2010.  Petitioner's motion for discovery was granted in part and denied in part on April 1, 2011.  The deadline for completing discovery was extended several times at the request of the parties.  On August 1, 2012, petitioner filed a renewed motion for an evidentiary hearing.  Shortly thereafter, the case was reassigned to the undersigned.  The fully briefed fifth amended petition and the motion for an evidentiary hearing now are before the court.[4]

**LEGAL STANDARD**

**1.     PRE-AEDPA STANDARD**

Because petitioner's initial federal habeas petition was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, pre-AEDPA standards apply to all of petitioner's claims, even those that were added by amendment after the AEDPA's effective date. *See Thomas v. Chappell*, 678 F.3d 1086, 1100–01 (9th Cir. 2012).  Under those standards, this court must "presume that the state court's findings of historical fact are correct and defer to those findings in the absence of convincing evidence to the contrary or a demonstrated lack of fair support in the record." *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001) (internal quotation marks omitted) (citing 28 U.S.C. 2254(d) (1994)).  State court determinations with respect to mixed questions of law and fact are reviewed *de novo*. *Ibid.*  Pure questions of law are reviewed *de novo*. *Ibid.*  Ultimately, the burden is on the petitioner to prove a constitutional error by a preponderance of the evidence. *McKenzie v. McCormick*, 27 F.3d 1415, 1418–19 (9th Cir. 1994) (abrogation on other grounds recognized by *Sivak v. Hardison*, 658 F.3d 898, 922 (9th Cir. 2011).

---

[4] Previously, it was contemplated that the parties would file and brief a second round of summary judgment motions in addition to briefing the fifth amended petition and a renewed motion for an evidentiary hearing (*see* Scheduling Order, July 27, 2009; Rescheduling Order, Oct. 19, 2009). Ultimately, the parties were not directed to file motions for summary judgment.  Petitioner's claims are addressed more than adequately in the 1,000-plus pages (exclusive of exhibits) that comprise the petition, answer, and traverse and the 500-plus pages (exclusive of exhibits) that comprise the motion for an evidentiary hearing, the opposition, and the reply.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Under pre-AEDPA standards, a habeas petitioner "is entitled to an evidentiary hearing if (1) he has alleged facts that, if proved, would entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999).  A petitioner who satisfies the first prong is said to have presented "a colorable claim for relief." *Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005).  A petitioner may satisfy the second prong by showing that:  "(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Townsend v. Sain*, 372 U.S. 293, 313 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11–12 (1992). If a hearing is requested under *Townsend* factor five — that is, because the facts were not adequately developed in the state court — the petitioner must show cause for failing to develop the record and prejudice resulting from that failure, or that a fundamental miscarriage of justice will result from the failure to hold an evidentiary hearing. *Keeney*, 504 U.S. at 12.

"No hearing is required if there are no disputed facts and the claim presents a purely legal question." *Williams v. Calderon*, 52 F.3d 1465, 1484 (9th Cir. 1995) (internal quotation marks and citation omitted).  Moreover, "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998).

**2.   INEFFECTIVE ASSISTANCE OF COUNSEL**

The Sixth Amendment guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To establish a deprivation of this right, a petitioner must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Id.* at 687.

To prove deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Id.* at 688.  "[T]he relevant inquiry under *Strickland* is not what defense counsel could have

**United States District Court**
For the Northern District of California

pursued, but rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998). "'Judicial scrutiny of counsel's performance must be highly deferential,' and courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *West v. Ryan*, 608 F.3d 477, 486 (9th Cir. 2010) (quoting *Strickland*, 466 U.S. at 689). A difference of opinion as to trial tactics is insufficient to establish ineffective assistance. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).

To prove prejudice, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

**ANALYSIS**

**1.    PROCEDURAL DEFAULT**

Respondent asserts in both his answer and opposition to the motion for an evidentiary hearing that a number of petitioner's claims are procedurally defaulted. Under the doctrine of procedural default, "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012). "A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." *Ibid.* "A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Ibid.*

A prior order herein denied respondent's motion to dismiss based upon state procedural defaults. *See* Order Denying Respondent's Motion to Dismiss Claims Based on State Procedural Defaults, Sept. 24, 1999. Respondent's motion for leave to seek reconsideration of that ruling likewise was denied. *See* Order Denying Respondent's Application to File a Motion for

9

United States District Court

For the Northern District of California

1  Reconsideration, Mar. 28, 2000.  Respondent had argued that certain claims were procedurally

2  defaulted because the California Supreme Court had denied them with citations to *In re Dixon*, 41

3  Cal. 2d 756 (1953), which generally precludes state habeas relief as to claims not raised on direct

4  appeal, and *In re Clark*, 5 Cal. 4th 750 (1993), which precludes state habeas relief as to untimely

5  claims.  Additionally, respondent had argued that some claims were procedurally defaulted because

6  the California Supreme Court had denied them under the contemporaneous objection rule.  This

7  court's prior orders determined that the *Dixon*, *Clark*, and contemporaneous objection bars did not

8  constitute adequate state grounds for denying petitioner's federal habeas claims.  Because the state

9  procedural defaults were determined to be inadequate, petitioner's request for oral argument as to

10 "cause and prejudice" and "miscarriage of justice" was denied as moot.  *See* Order Denying

11 Respondent's Motion to Dismiss Claims Based on State Procedural Defaults, Sept. 24, 1999, at 2.

12      Respondent acknowledges the court's prior orders, but he contends that the application of

13 the procedural default doctrine should be reconsidered in light of the subsequent decisions *Walker v.*

14 *Martin*, 131 S.Ct. 1120 (2011), and *Beard v. Kindler*, 558 U.S. 53 (2009).  *Walker* and *Beard*

15 clarified that a state procedural rule may be "firmly established and consistently followed" even if

16 the rule is discretionary.  *Walker*, 131 S.Ct. at 1128; *Beard*, 558 U.S. at 60.  *Walker* held expressly

17 that California's timeliness rule, set forth in *Clark* and its progeny, is an independent state ground

18 that is adequate to bar federal habeas relief.  *Walker*, 131 S.Ct. at 1131.

19      In this district, a party seeking reconsideration of a court order must obtain leave of the court

20 to file a motion for reconsideration.  Civ. L.R. 7-9(a).  The Civil Local Rules provide expressly for

21 the filing of such a motion based upon "a change of law occurring after the time of such order."

22 Civ. L.R. 7-9(b)(2).[5]  If respondent had filed a motion for leave to seek reconsideration under the

23 Civil Local Rules, petitioner would have been afforded an opportunity to argue cause and prejudice

24 or other grounds for denying reconsideration.  These issues are not adequately framed by the

25 briefing currently before the court.  Accordingly, reconsideration of the court's prior orders

26 addressing procedural default would be inappropriate in this context.

27

28

---

[5] The Civil Local Rules are applicable to habeas proceedings except to the extent they are
inconsistent with the Habeas Corpus Local Rules.  Habeas L.R. 2254-1.

United States District Court
For the Northern District of California

2. *TEAGUE v. LANE*

Respondent contends in his answer that several of petitioner's claims are barred by the nonretroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989), which prevents a federal court from granting habeas relief to a state prisoner based on a constitutional rule of criminal procedure announced after his or her conviction and sentence became final. A prior order herein granted in part and denied in part respondent's motion to dismiss claims based upon *Teague*. *See* Order Granting in Part and Denying in Part Respondent's Motion to Dismiss Claims Based on *Teague* Doctrine, Nov. 19, 1999. Claims 15(a) and 15(f) were dismissed and respondent's motion otherwise was denied. Respondent acknowledges that rejection, but he nonetheless reasserts the same *Teague* arguments in his answer. As is discussed above, respondent's answer to the petition is not an appropriate procedural vehicle for seeking reconsideration of the court's orders. Accordingly, reconsideration of the court's prior order addressing application of *Teague* would be inappropriate in this context.

The court's prior order did not address, and does not preclude, application of the *Teague* bar to claims 32 and 34, addressed below. Claims 32 and 34 were added to the petition several years after respondent's initial *Teague* arguments were raised and addressed by the court.

3. CLAIM 3

In claim 3, petitioner maintains that trial counsel was ineffective for failing to discover evidence implicating Dino in Rosie's rape and murder, and that the prosecution withheld evidence about Dino.[6] This claim was raised in petitioner's first state habeas petition and was denied on the merits in a summary opinion by the California Supreme Court. Under pre-AEDPA standards, the state court's legal determinations regarding petitioner's ineffective assistance claims are subject to *de novo* review. *Ben-Sholom v. Ayers*, 674 F.3d 1095, 1199 (9th Cir. 2012).

Under California law in effect at the time of petitioner's trial, evidence of a third party's culpability was admissible if it was "capable of raising a reasonable doubt of defendant's guilt." *People v. Hall*, 41 Cal. 826, 833 (1986). "[E]vidence of mere motive or opportunity to commit the

---

[6] Petitioner's first claim has been designated as claim "3" or "III" throughout these proceedings. There is no claim "1" or "2," nor does it appear that there ever has been.

11

United States District Court

For the Northern District of California

crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt:  there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." *Ibid.*

Petitioner claims that trial counsel should have investigated Dino, who was the last person to see petitioner prior to the murder, because counsel knew that Dino had a history of violence and drugs and had lied about his own whereabouts after parting ways with petitioner.  Petitioner offers several declarations in support of this claim, including the declaration of trial counsel Joseph Allen and lead defense investigator Howard McPherson.  McPherson stated that based on his prior experience in law enforcement and as a private investigator, he knew that Dino was a violent drug dealer and drug user (McPherson Decl. ¶ 7, Pet'r's Exh. 169).  Allen stated that the defense team knew from review of police reports that Dino had lied about his whereabouts after leaving petitioner (Allen Decl. ¶ 37, Pet'r's Exh. 1).  Dino first had told police that he had returned to the home of his friend Boyd, then he claimed to have spent the evening at the home of his girlfriend, Tami Scribner (*ibid.*).  The police reports stated that Dino had claimed to have known the victim (*ibid.*).  Someone told a defense investigator that Dino claimed to have seen petitioner washing up after the crime, raising a question as to whether Dino had been at the crime scene (*ibid.*).  Allen stated that despite this information, the defense did not investigate Dino further because of petitioner's confessions (*id.* ¶ 38).

Petitioner contends that had defense counsel investigated Dino, counsel would have discovered information that could have been used to implicate Dino in the crimes.  He submits a number of declarations in support of this contention, including the declaration of petitioner's brother, Robert Clark, who stated that Dino admitted to being present during the murder (Clark Decl. ¶ 10, Pet'r's Exh. 2); the declaration of Debra Dillman, a family friend, who stated that Dino had said that he and petitioner met Rosie at the Greyhound bus depot (Dillman Decl. ¶ 9, Pet'r's Exh. 5); and the declaration of Tami Scribner, Dino's former girlfriend, who said that shortly after petitioner's arrest Dino told her that he had found a screwdriver in a storage space under the springs of Smith's car, and that she thought it was odd that Dino would know about the storage space in Smith's car (Scribner Decl. ¶¶ 21–22, Pet'r's Exh. 8).

**United States District Court**
For the Northern District of California

1  Respondent argues that defense counsel made a tactical decision not to pursue a defense

2  based upon Dino's culpability.  Respondent cites to a polygraph that Dino took during the

3  investigation, and in particular to Dino's responses that he did not see Rosie the night of the murder,

4  did not participate in the murder, and did not witness the murder (Polygraph, Pet'r's Exh. 141).  In

5  another response Dino said that he returned to Boyd's house after leaving petitioner (*ibid.*).  The

6  polygraph indicated deception only with respect to the question about returning to Boyd's house.

7  Dino passed with respect to his statements that he was not involved in the crimes.

8  Respondent also cites Dino's declaration, which stated as follows:

9  I was contacted by Richard's defense team before his trial but they were very rude to
10  me.  They only questioned me about my role in the murder and were not interested in
   anything else.  They tried to convince me that I did the murder.  Then they tried to
   plant in my head that Mike Taylor was guilty of the murder.  I even believed them
11  for a while.

12  (Dino Decl. ¶ 13, Pet'r's Exh. 10).

13  Taken as a whole, the record indicates that trial counsel considered pursuing a third party

14  defense, but discarded that strategy in light of petitioner's confessions.  While "'there is simply no

15  consensus that polygraph evidence is reliable,'" *Goel v. Gonzales*, 490 F.3d 735, 739 (9th Cir. 2007)

16  (quoting *United States v. Scheffer*, 523 U.S. 303, 309 (1998)), that fact that Dino passed the

17  polygraph with respect to his responses regarding his lack of involvement in the crimes may have

18  played a role in counsel's decision as well.  Petitioner's hindsight view that a third party defense

19  would have been viable does not suggest that trial counsel's choice at the time of trial was

20  unreasonable.  A difference of opinion as to trial tactics is insufficient to establish ineffective

21  assistance.  *Mayo*, 646 F.2d at 375.

22  Even had counsel investigated Dino, it appears that at most counsel would have discovered

23  that some of petitioner's friends and family would have claimed that Dino knew Rosie and/or was

24  present at the crime scene.  However, that evidence of motive and opportunity may not even have

25  been admissible under *Hall*, *supra*.  Even if the evidence had been admitted at trial, most likely the

26  jury would have inferred that *both* men were involved in Rosie's rape and murder given all of the

27  evidence linking petitioner to the crime scene (*e.g.*, wine cooler, bloody clothing, and confessions).

28  It simply cannot be said that there is a reasonable probability that if counsel had investigated Dino

13

the result of the trial would have been different. *See Strickland*, 466 U.S. at 694.

Petitioner argues that the prosecution withheld evidence about Dino and used false evidence. Claim 20 herein asserts numerous violations of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and the law regarding the prosecution's obligations to disclose material and favorable evidence is discussed in connection with that claim. With respect to the present claim, petitioner appears to be asserting that the prosecution's suppression of evidence affected trial counsel's decision not to pursue a third party defense. For example, petitioner claims that the prosecution failed to disclose that Dino requested a deal and that Dino had said that he and petitioner went to Munchie's bar the night of the murder (Grele Decl. ¶¶ 4–5). To the extent that the defense did not obtain the allegedly suppressed material from other sources — the defense became aware of the Munchie's bar visit because it was mentioned in a Ukiah Police Department report that was disclosed to the defense — it is entirely unclear what effect the material would have had on the case. As discussed *supra*, counsel made a reasoned decision not to pursue a third party defense.

Because petitioner has not presented a colorable claim of ineffective assistance on either prong of the *Strickland* test, the motion for an evidentiary hearing is denied as to this claim, and the claim is denied on the merits.

**4.    CLAIM 4**

In claim 4, petitioner maintains that his constitutional rights were violated by evidence seized from him and from the admission of his custodial statements. Specifically, he claims that the bloody clothing taken from Smith's car and the sample of his blood taken after arrest violated his rights under the Fourth Amendment; that his subsequent incriminating statements were fruits of the poisonous tree because he was arrested based on illegally seized evidence; that his custodial statements were elicited in violation of the Fifth, Sixth, and Fourteenth Amendments; and finally, that trial counsel was ineffective in litigating these claims. These claim were raised on direct appeal and were denied by the California Supreme Court in a reasoned opinion.

**Seizure of Evidence**

Petitioner's claims that the bloody clothing and blood sample were seized in violation of his constitutional rights are not cognizable. "A Fourth Amendment claim is not cognizable in federal

United States District Court
For the Northern District of California

1   habeas proceedings if a petitioner has had a full and fair opportunity to litigate the claim in state

2   court." *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996) (citing *Stone v. Powell*, 428 U.S.

3   465, 481–82 (1976)).  "The relevant inquiry is whether petitioner had the opportunity to litigate his

4   claim, not whether he did in fact do so or even whether the claim was correctly decided." *Ibid.*  The

5   Ninth Circuit has held expressly that California's suppression procedures, set forth in California

6   Penal Code Section 1538.5, provide an adequate opportunity to litigate a Fourth Amendment claim.

7   *Gordon v. Duran*, 895 F.2d 610, 613–14 (9th Cir. 1990).

8          As the California Supreme Court recognized,

9          The Mendocino County Superior Court . . . held a hearing on defendant's motion
           pursuant to section 1538.5.  Ukiah Police Department Officers Fred Kelley, Ed Gall,
10         Wayne McBride and Charles Durfee testified at the hearing.  An audiotape cassette
           and a transcript of a tape-recorded statement by the defendant were also admitted into
11         evidence.

12  *Clark*, 5 Cal. 4th at 978.  The suppression hearing addressed both the clothing seized from Smith's

13  car and the blood sample taken from petitioner.  *Id.* at 978–79, 993 n.19.  Petitioner nonetheless

14  argues that he did not have a full and fair opportunity to litigate his claims in the state court because

15  trial counsel was ineffective, the prosecution withheld critical evidence, and the police officers lied

16  while testifying.  Petitioner's claims regarding trial counsel's alleged ineffectiveness and the

17  prosecution's alleged misconduct are discussed and rejected *infra* in the context of claims 7–13 and

18  20.  Petitioner's assertion that the police officers lied provides no basis for concluding that the state

19  proceedings were inadequate.  Petitioner contends that the suppression hearing was inadequate with

20  respect to the blood sample because the trial court did not make an express finding of probable

21  cause but merely articulated the ultimate ruling that the blood sample was admissible.  This

22  contention does not establish that petitioner was denied an *opportunity* to litigation the suppression

23  issues.

24         Because petitioner's Fourth Amendment claims are not cognizable, the motion for an

25  evidentiary hearing is denied as to these claims, and the claims are denied.

26         **Custodial Statements**

27         In light of the disposition of petitioner's Fourth Amendment challenge, his challenge to the

28  admission of his custodial statements as fruit of the poisonous tree is without merit.  Turning to his

15

**United States District Court**
For the Northern District of California

alternative challenge, a defendant's statements made during a custodial interrogation are admissible only if the defendant made a voluntary, knowing, and intelligent waiver of his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Whether the waiver is voluntary and whether it is knowing and intelligent are two separate inquiries. *Derrick v. Peterson*, 924 F.2d 813, 820 (9th Cir. 1990). The test for the voluntary prong is "whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). The test for the knowing and intelligent prong is whether "under the totality of the circumstances [the waiver] was made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005), *amended*, 416 F.3d 939. The prosecution has the burden of proving waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

In the context of collateral review under pre-AEDPA standards, a state court's determination that a defendant knowingly and intelligently waived his *Miranda* rights is entitled to a presumption of correctness under section 2254(d), as are findings of historical or subsidiary facts. *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991). Whether a defendant's waiver was voluntary is a mixed question of law and fact subject to *de novo* review.

Petitioner asserts that his rights were violated by the admission at trial of the "patrol car" statement, in which petitioner confessed to the crimes during transport to the hospital for a blood sample, and the "taped" statement, in which petitioner was recorded confessing to the crimes upon returning to the police station from the hospital.

After a suppression hearing, the trial court found that petitioner had made a voluntary, knowing and intelligent waiver of his *Miranda* rights. The California Supreme Court likewise found petitioner's custodial statements to be voluntary, knowing, and intelligent. *People v. Clark*, 5 Cal. 4th at 987 ("The trial court found that defendant's waiver of his *Miranda* rights was knowing, intelligent and voluntary beyond a reasonable doubt. After independent review of the record, we agree with the trial court's findings.") (internal citation omitted).

16

United States District Court

For the Northern District of California

As noted *supra*, the state court's determination that petitioner knowingly and intelligently waived his rights is entitled to a presumption of correctness.  Petitioner contends that this presumption is rebutted by evidence that the prosecution withheld evidence relevant to the suppression hearing, thus rendering the hearing unfair.  Petitioner claims that the prosecution failed to disclose jail records indicating that when petitioner was placed in the county jail on July 19 following his confessions, he was emotional and confused, and showed signs of drug withdrawal (O'Neill Decl. ¶¶ 1–4, Pet'r's Exh. 24).  Petitioner argues that if the jail records had been disclosed prior to the suppression hearing, the defense could have argued that petitioner was going through a drug withdrawal at the time of the confessions and did not knowingly and intelligently waive his rights.  This evidence is insufficient to rebut the presumption of correctness.  Petitioner's drug addictions were central to his defense from the beginning; it would hardly have surprised the trial court to discover that petitioner showed signs of drug withdrawal after he was placed in the county jail.  Moreover, such evidence would not have demonstrated that petitioner was unable to understand the nature of his waiver at an earlier point in the day.  Accordingly, it is unlikely that the records would have had any effect on the outcome of the suppression hearing.

Petitioner also claims that the prosecution withheld a report prepared by Glen Manda of the coroner's office.  That report described the wounds on Rosie's body, including puncture wounds on her back (Manda Report, Pet'r's Exh. 23).  The report also stated Officer Gall came to the mortuary and photographed Rosie's body on the morning of July 19 (*ibid.*).  During the patrol car statement petitioner told Kelley and Gall that he had stabbed Rosie in the back, and the prosecution argued at the suppression hearing that Kelley and Gall could not have planted that suggestion in petitioner's mind because they were not yet aware that Rosie had been stabbed in the back.  Petitioner argues that because the Manda Report is dated July 19 at 11:00 a.m., it is evidence that Gall actually did know that Rosie had been stabbed in the back at the time of petitioner's custodial statements, which occurred later that day.  While the Manda report would have supported an argument that petitioner's custodial statements were unreliable, it is unclear how it would have undermined the trial court's determination that petitioner understood the nature of his waiver.  Moreover, petitioner demonstrated knowledge of several details about the crime; even if the trial court had been informed

17

that the officers knew about Rosie's stab wounds prior to petitioner's confession, it highly unlikely the trial court would have found the statements unreliable or inadmissible.

The trial court found petitioner's waiver to be knowing and intelligent beyond a reasonable doubt, not merely by a preponderance, indicating that the trial court found the prosecution's showing to be very strong on the *Miranda* issues. *Clark*, 5 Cal. 4th at 987. The allegedly suppressed evidence would not have altered the outcome of the hearing. Even if the presumption of correctness were rebutted, and this court were to engage in a *de novo* review, there is no colorable claim based on this record that petitioner's confessions were not knowing and intelligent.

Nor does the record suggest that petitioner's "will was overborne" by Kelley and Gall. *See Leon Guerrero*, 847 F.2d at 1366. The taped statement, which was taken only a short while after the patrol car statement, demonstrates that petitioner had made an independent decision to confess. The California Supreme Court described the taped statement as follows:

> It is clear from the record that defendant evaluated whether he should waive his rights and give the Taped Statement. He spoke of the reasons that would prompt him to do so. He asked questions to help him evaluate his position. The interrogators, while avoiding giving the defendant detailed legal advice, provided information responsive to his questions. The interrogators were at all times courteous, polite, and restrained. Although the defendant was aware from his experience that morning in connection with the Sergeant's Room Statement that if he invoked his rights the questioning would cease, he did not do so. In fact, notwithstanding his vocalized soul-searching, the record reflects that he waived his rights three times prior to the initiation of substantive questioning.

> With respect to the specific comments to the effect of "what can a lawyer do for me," a review of the transcript and the cassette, including the tone and inflections of defendant's voice, reveals that defendant's "questions" were rhetorical in nature and linked to his repeated explanation of the reasoning behind the waiver of his rights. (*See People v. Thompson*, *supra*, 50 Cal.3d at p. 165.) Defendant repeatedly explained that he did not feel that a lawyer could assist him since he was guilty and previously had revealed this fact to the police. For these reasons, he was willing to talk without assistance of counsel.

*Clark*, 5 Cal. 4th at 990–91. For the same reasons articulated by the California Supreme Court, this order concludes that petitioner's waiver was voluntary.

Petitioner argues that his counsel was ineffective for failing to present evidence showing an impaired mental state at the time of the custodial statements. Counsel in fact made a substantial effort to show an impaired mental state, presenting medical testimony, mental health records regarding petitioner's past suicide attempt, blood analysis showing petitioner's drug use, testimony

18

**United States District Court**
For the Northern District of California

1    regarding petitioner's mood shifts, and family history.

2          Because petitioner has not presented a colorable claim of a *Miranda* violation, the motion for

3    an evidentiary hearing is denied as to this claim, and the claim is denied on the merits.

4    **5.    CLAIM 5**

5          In claim 5, petitioner maintains that he was denied the right to conflict-free counsel when he

6    was provided representation by a public defender who planned to run for district attorney.  This

7    claim was raised on direct appeal and was denied by the California Supreme Court in a reasoned

8    opinion.

9          "Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is

10   a correlative right to representation that is free from conflicts of interest."  *Wood v. Georgia*, 450

11   U.S. 261, 271 (1981).  The right to conflict-free counsel is violated only if the conflict "adversely

12   affected" counsel's performance.  *Alberni v. McDaniel*, 458 F.3d 860, 870 (9th Cir. 2006).  "To

13   establish a violation of the right to conflict-free counsel, the petitioner must show either that (1) in

14   spite of an objection, the trial court failed to allow him the 'opportunity to show that potential

15   conflicts impermissibly imperil his right to a fair trial;' or (2) that an actual conflict of interest

16   existed."  *Alberni*, 458 F.3d at 869–70.  "'[A]n actual conflict of interest' mean[s] precisely a

17   conflict *that affected counsel's performance* — as opposed to a mere theoretical division of

18   loyalties."  *Mickens v. Taylor*, 535 U.S. 162, 171 (2002).  On habeas review, a petitioner's claim of

19   conflict of interest on the part of counsel is a mixed question of fact and law subject to *de novo*

20   review.   *Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994).

21         Susan Massini, then a public defender, was appointed to represent petitioner in July 1985.

22   At some point in 1985, she decided to run for the office of Mendocino County District Attorney.  In

23   September 1985, Massini requested appointment of Joseph Allen, an experienced capital defense

24   lawyer, as co-counsel.  Allen was not a member of the public defender's office.  Massini and Allen

25   jointly represented petitioner through June 1986, when Allen moved to recuse the Office of the

26   Mendocino County District Attorney on the ground that Massini had been elected district attorney

27   and would assume office in January 1987.  In July 1986, the trial court granted the recusal motion.

28   Jury *voir dire* began in October 1986, and presentation of evidence began in March 1987.  Petitioner

claims that because of her political ambitions, Massini did not provide him with zealous representation.

A defense attorney's plans of future employment as a prosecutor do not create an actual conflict.  *See Garcia*, 33 F.3d at 1199 (no conflict when defense attorney had been hired by district attorney's office to start employment following petitioner's trial).  Petitioner thus must show that Massini's political agenda actually affected her performance adversely.  Petitioner recites numerous ways in which Massini allegedly provided inadequate representation, including her failure to interview certain witnesses; failure to secure blood, urine, and hair samples for testing; failure to secure neuropsychological and physical testing; soliciting an inadequate expert report; failure to provide effective assistance at the petitioner's preliminary hearing; and failure to contest the admissibility of petitioner's blood sample.  Most of these allegations form bases for petitioner's numerous claims of ineffective assistance of trial counsel, and lack merit for the reasons discussed in connection with those claims.  Moreover, the record reflects that Massini represented petitioner on her own for only two months before bringing Allen on board.  Allen did not raise any concerns with the trial court or with petitioner regarding a conflict.  Based upon this record, petitioner has failed to present a colorable claim of actual conflict.  The motion for evidentiary hearing is denied as to this claim, and the claim is denied on the merits.

**6.    CLAIM 6**

In claim 6, petitioner maintains that he was denied the right to conflict-free counsel because defense counsel Ronald Brown had represented prosecution witnesses.  This claim was raised on direct appeal and was denied by the California Supreme Court in a reasoned opinion.

When Massini withdrew from the case, Brown became the Mendocino County Public Defender and co-counsel to petitioner.  After reading the police reports, Brown realized that he could not represent both petitioner and a pre-existing client, Matt Williams, who was a prosecution witness.  Brown raised the issue with the trial court, was instructed to terminate his representation of Williams, refrain from disclosing any confidential information about Williams to Allen, and permit Allen to conduct the cross-examination of Williams.  That is how counsel proceeded.  In addition, Brown's office, although not Brown personally, had represented several other witnesses, including

Smith, Boyd, and Dino.  Brown terminated an ongoing representation of Smith by the public defender's office.  The conflicts were raised to the trial court, and petitioner waived any conflict.

Petitioner asserts that the waiver was not valid, that actual conflicts existed with respect to witnesses Smith, Boyd, Dino, and Williams, and that the defense decided not to use other potential witnesses because defense counsel previously had represented them.  Even assuming that petitioner's waiver was invalid, petitioner has failed to make out a colorable claim that the alleged conflicts adversely affected counsel's performance.  For example, petitioner suggests that a number of witnesses should have been called to testify as to their observations of petitioner in the days before and after the crime.  He presents their declarations to demonstrate that such testimony would have been helpful to the defense.  Michael Taylor stated that petitioner looked terrible in the days before the murder, "like he had been awake for days" (Taylor Decl. ¶ 8, Pet'r's Exh. 181); Shauna Taylor stated that Smith told her that he and petitioner had been doing a lot of drugs the week before the murder, and that petitioner was "particularly strung out on crank" (Shauna Taylor Decl. ¶ 6, Pet'r's Exh. 182); Brenda Smith stated that when petitioner moved to Ukiah with Smith, he started looking "scraggly" and like he was using drugs (Brenda Smith Decl. ¶ 14, Pet'r's Exh. 183); Vincent Rutter stated that shortly after petitioner's arrest, he saw petitioner at the county jail, and petitioner looked like he was in withdrawal from drugs (Rutter Decl. ¶ 8, Pet'r's Exh. 33).  These witnesses' lay opinions are not so valuable that the failure to use them gives rise to an inference that counsel's performance was adversely affected.  Other evidence at trial established petitioner's drug history.  At most, petitioner's contention that trial counsel should have used this and similar evidence constitutes a disagreement with counsel's tactics.

Because petitioner has failed to present a colorable claim of actual conflict, the motion for an evidentiary hearing is denied as to this claim, and the claim is denied on the merits.

**7.   CLAIMS 7–12**

In claims 7–12, petitioner contends that trial counsel was ineffective for failing to obtain and present evidence that would have corroborated petitioner's defense of mental disease produced by substance abuse.  Specifically, petitioner alleges that counsel was ineffective for failing to:  collect blood, hair, and tissue samples to substantiate petitioner's drug and alcohol abuse (claim 7); consult

United States District Court

For the Northern District of California

with an independent toxicologist (claim 8); retain an independent psychopharmacologist (claim 9); preserve, investigate, and present evidence regarding petitioner's history of substance abuse (claim 10); investigate, prepare, and present evidence of petitioner's complete life history (claim 11); and investigate, prepare, and present evidence of petitioner's mental and emotional impairments (claim 12). These claims were raised in petitioner's first state habeas petition and were denied on the merits in a summary opinion by the California Supreme Court.

None of the evidence presented in connection with these claims suggests that counsel's representation was unreasonable or prejudiced the defense. Counsel did, of course, put on a defense based in large part on petitioner's drug use and mental state. There is no merit to petitioner's assertions that counsel should have obtained their own blood and hair samples rather than relying upon the samples taken hours after the murder (claim 7), that counsel should have hired an independent toxicologist and an independent psychopharmacologist rather than relying on Dr. Baselt, who was hired jointly by the defense and the prosecutor (claims 8 and 9), and that counsel should have presented petitioner's addictions and mental state to the jury in a manner different than they elected (claims 10–12). A difference of opinion as to trial tactics is insufficient to establish ineffective assistance. *Mayo*, 646 F.2d at 375. Based upon an independent review of the record, it cannot be said that these trial decisions "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

Because petitioner has failed to present a colorable claim of ineffective assistance, the motion for an evidentiary hearing is denied as to these claims, and the claims are denied on the merits.

**8.    CLAIM 13**

In claim 13, petitioner maintains that trial counsel provided ineffective assistance by failing adequately to prepare defense psychologist Dr. Peter Mayland, for his testimony at the suppression motion. This claim was raised in petitioner's first state habeas petition and was denied on the merits in a summary opinion by the California Supreme Court.

Mayland was appointed as a mental health consultant in the week after petitioner's arrest in

1985.  Mayland in turn recommended the retention of psychologist Dr. Rex Beaber to advise whether petitioner had an impairment that would permit a mental health defense (Mayland Decl. ¶ 6, Pet'r's Exh. 37).  Beaber interviewed petitioner and thereafter prepared a letter summarizing his findings, referred to herein as the "Beaber letter" (*id.* ¶ 9).  Beaber gave Mayland a copy of the letter (*ibid.*).  Beaber thought petitioner was of above average intelligence and a "sexual sociopath" (Mayland Decl. ¶¶ 8–9, Pet'r's Exh. 170).  Defense counsel called Mayland to testify at the suppression hearing; Mayland gave his opinion that petitioner's low mental functioning after his arrest precluded him from making a knowing and intelligent waiver of his *Miranda* rights (Mayland Decl. ¶¶ 12–15, Pet'r's Exh. 37).  During Mayland's cross-examination, he disclosed that he had the Beaber letter (*id.* ¶ 15).  He also disclosed that he had discussed the crime with petitioner (Mayland Decl. ¶ 21, Pet'r's Exh. 170).

Defense counsel Allen believed that the trial court had stated that Mayland's suppression hearing testimony could not be used at trial (Allen Decl. ¶ 11, Pet'r's Exh. 168).  Defense investigator McPherson states that he was present at an unreported chambers meeting when the trial court, the prosecution, and the defense agreed that if Mayland testified at the suppression hearing, his testimony could not be used at trial (McPherson Decl. ¶ 26, Pet'r's Exh. 169).  Based upon that understanding, Allen did not obtain a formal order precluding the use of Mayland's testimony at trial.  The prosecutor was permitted to use Mayland's testimony and information contained in the Beaber report to impeach petitioner's mental health experts at the guilt phase of the trial.

Petitioner asserts that defense counsel was ineffective for failing to realize the extent to which Mayland had discussed the details of the crime with petitioner, for failing to know that Mayland had a copy of the Beaber letter, and for failing to obtain a formal order precluding the use of Mayland's testimony at trial.

Viewing these facts in hindsight, it is easy to say that the defense should have obtained a formal order regarding the use of Mayland's testimony.  However, both Allen and McPherson stated unequivocally that the trial court represented that it would not permit the use of Mayland's suppression hearing testimony at trial.  The question is whether Allen's reliance on the trial court's representation was objectively unreasonable.  "'Judicial scrutiny of counsel's performance must be

highly deferential.'"  *West*, 608 F.3d at 486 (quoting *Strickland*, 466 U.S. at 689).  It was not objectively unreasonable for defense counsel to trust what he thought was a verbal agreement between the court and the parties.

Because petitioner has not presented a colorable claim of ineffective assistance, the motion for an evidentiary hearing is denied and the claim is denied on the merits.

**9.    CLAIM 14**

In claim 14, petitioner asserts yet more alleged deficiencies on the part of trial counsel at both the guilt and penalty phases, including:  Allen's failure to provide effective assistance during a period of illness; failure to ensure petitioner's presence at all critical stages of the trial; ineffective *voir dire*; failure to press the trial court to investigate bias after jurors saw petitioner shackled; failure to conduct discovery effectively; failure to challenge pathology evidence; failure to expose false testimony of police officers; failure to object during trial; failure to offer lay testimony regarding petitioner's mental state; failure to present remorse evidence; failure to rebut the suggestion that petitioner feigned religious devotion during the trial; failure to present particular mitigating evidence; failure to ensure that petitioner's allocution would be heard by the jury; and failure to object to errors in jury instructions.  These claims were raised in petitioner's second state habeas petition and were denied as untimely and on the merits in a summary opinion by the California Supreme Court.

"[A]llegations that every lawyer that ever touched this case is ineffective for failing to raise each and every issue that could ever come to the mind of a lawyer during the course of . . . years of litigation without respect to the professional judgment of the attorneys involved, effective advocacy or the viability of any of the issues" are not favored.  *See Poland v. Stewart*, 69 F.3d 573, 577 (9th Cir. 1999).  A *de novo* review of the record establishes that trial counsel's representation fell well within the professional norm and thus was not deficient.  For example, when trial was delayed for two weeks as a result of Allen's intestinal bleeding, the trial court stated that it would monitor Allen's future performance to ensure that he could continue to represent petitioner adequately.  The trial court did not raise any questions about Allen's performance thereafter.  Petitioner does not allege that Brown was sick or otherwise incapacitated during this period.

United States District Court
For the Northern District of California

In other examples, petitioner claims that counsel was ineffective for stipulating to the dismissal of potential jurors for hardship and/or strong beliefs regarding capital punishment and for failing to press for a bias inquiry of the jurors who saw petitioner in restraints. Counsel chose to streamline the jury selection process by relying initially upon questionnaires, and chose not to draw attention to petitioner's shackles by requesting individual questioning. It cannot be said that these choices were unreasonable under the circumstances.

Because petitioner has failed to make out a colorable claim of ineffective assistance, the motion for an evidentiary hearing is denied as to this claim and the claim is denied on the merits.

**10.     CLAIM 15**

In claim 15, petitioner maintains that errors committed by the trial court and the prosecutor during the impaneling of the guilt phase jury resulted in violations of his constitutional rights. The claim is divided into seven subclaims labeled (a) through (g). These claims were raised in petitioner's second state habeas petition and were denied on procedural grounds and on the merits in a summary opinion of the California Supreme Court.

A prior order herein dismissed claims 15(a) and 15(f) under the *Teague* doctrine. *See* Order Granting in Part and Denying in Part Respondent's Motion to Dismiss Claims Based on *Teague* Doctrine. The May 2000 Order granted summary judgment for respondent as to claims 15(b)–(e) and 15(g). Petitioner nonetheless requests an evidentiary hearing as to claims 15(b)–(e) and 15(g).

**Claim 15(b)**

In claim 15(b), petitioner maintains that the prosecutor improperly exercised peremptory challenges to remove five prospective jurors who were Hispanic. "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race. First, a defendant must make a *prima facie* showing that the prosecutor has exercised a peremptory challenge on the basis of race; second, if the requisite showing is made, the prosecution must articulate a race-neutral explanation for striking the juror in question; and third, the trial court must determine whether the defendant has shown purposeful discrimination. *Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008).

United States District Court
For the Northern District of California

The May 2000 Order noted that the prosecutor exercised his first two peremptory challenges against jurors with Hispanic surnames; that defense counsel objected; and that the trial court held a hearing regarding the prosecutor's reasons for excusing prospective jurors Raul De La Cerda and Norma Castillo.  The prosecutor stated that he was concerned that Mr. De La Cerda had two sons and appeared to have a slight difficulty with the English language.  With respect to Castillo, the prosecutor stated that his challenge was based on many factors, but that the strongest reason for removing her was her initial response that she could not vote for the death penalty.  The trial court accepted those reasons and allowed the challenges.  The prosecutor subsequently removed three other jurors with Hispanic surnames — Maximo Cano, Mary Ann Badala, and Lorenzo Belveal — but defense counsel did not object to those removals.

The May 2000 Order determined that petitioner's claim could be evaluated on the trial record without an evidentiary hearing and that the prosecutor's proffered reasons were not implausible or pretextual.  The order noted that even comparing Castillo's responses with those of the four other jurors who expressed reservations about the death penalty, Castillo made the strongest initial statement that she could not vote for death.  The order also concluded that De La Cerda's questionnaire responses, which indicated that he read the Mercury News daily, did not establish pretext with respect to the prosecutor's stated belief that De La Cerda had difficulty with the English language.  Based upon this record, summary judgment was granted for respondent.

Petitioner now presents new evidence in the form of De La Cerda's declaration dated June 27, 2000, stating that he is fluent in English (De La Cerda Decl. ¶ 4, Pet'r's Exh. 184).  The declaration is problematic.  It is appended to the declaration of defense investigator Jon Frappier, who stated that when he went to De La Cerda's home in April 2006 to confirm the information contained in the declaration, De La Cerda said that he did not recall being interviewed about his jury experience previously; that the signature on the June 27, 2000 declaration was not his; and that he had suffered a stroke in 2000 (Frappier Decl. ¶¶ 3–7, Pet'r's Exh. 184).  De La Cerda's wife, who was present, said that she did not recall any prior interview and that she was always with De La Cerda and would have remembered if he had been interviewed (id. ¶¶ 8–9).  Frappier represented that De La Cerda read the June 27, 2000 declaration and opined that it was accurate in all relevant

respects (*id*. ¶ 5).  Even assuming that De La Cerda's declaration is admissible, and that he is fluent in English, it does not follow that the prosecutor's stated belief that De La Cerda had difficulty with English was pretextual.  The trial judge, who heard De La Cerda's *voir dire*, did not find the prosecutor's assertion fantastical or implausible.  A trial court's first-hand observations are of great importance in a *Batson* inquiry, because "determinations of credibility and demeanor lie peculiarly within a trial judge's province."  *Snyder*, 552 U.S. at 477.

Petitioner also contends that an adverse inference should be drawn from the prosecutor's failure to preserve his jury selection notes.  Petitioner has not cited any legal authority for such an inference.

Petitioner asserts that the record does not reflect the prosecutor's reasons for excluding Cano, Badala, and Belveal, and that an evidentiary hearing is required to ascertain whether those reasons were discriminatory.  The prosecutor was not called upon to explain his reasons because petitioner did not object to the exercise of peremptory challenges with respect to Cano, Badala, and Belveal.  "[A]n objection at trial is a prerequisite to a *Batson* challenge for purposes of habeas review."  *Haney v. Adams*, 641 F.3d 1168 (9th Cir. 2011).  Accordingly, petitioner may not maintain a *Batson* claim based upon the removal of Cano, Badala, and Belveal.

Because the trial court conducted a full and fair hearing, because the facts necessary to evaluate petitioner's *Batson* claim exist in the record, and because it is extremely unlikely that an evidentiary hearing would yield any further information about the prosecutor's state of mind more than twenty-five years after trial, the motion for an evidentiary hearing is denied as to this claim.  Petitioner has not presented a factual or legal basis for reconsidering the court's prior disposition of this claim.  Accordingly, the claim is denied on the merits.

**Claim 15(c)**

In claim 15(c), petitioner maintains that the trial court improperly excused prospective jurors based upon their responses to written questionnaires without conducting any oral *voir dire*.  The record reflects that jury selection was taking a great deal of time, in part because many jurors could not serve, and that the trial court tried to address this issue by directing counsel to discuss stipulations to remove jurors for hardship and cause based on their questionnaires.  With respect to

United States District Court

For the Northern District of California

hardship, the trial court directed counsel to remove those with low family incomes or entry level jobs, and small employers.  Counsel stipulated to excusing 124 prospective jurors based on questionnaire responses indicating that they were opposed to the death penalty, met the hardship parameters outlined by the judge, or both.  Petitioner argues that the procedure violated his constitutional rights.

The May 2000 Order construed the claim as an equal protection challenge based upon exclusion of low-income persons.  The order determined that petitioner had not made out a colorable claim because the general hardship parameters outlined by the trial court did not result in the exclusion of a distinct, cognizable class.  *See Castaneda v. Partida*, 430 U.S. 482, 494 (1977) (holding that in order to show that an equal protection violation occurred during jury selection, "[t]he first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws").  Petitioner has not presented a factual or legal basis for reconsidering the court's prior determination.  Moreover, petitioner's own allegations make clear that many jurors were dismissed based upon a combination of hardship and opposition to the death penalty, which undercuts an equal protection claim based upon the discriminatory exclusion of low-income persons.

Petitioner argues that the May 2000 Order failed to address the aspect of the claim asserting that dismissal of jurors who indicated opposition to the death penalty skewed the jury panel in the prosecution's favor.  To the extent that petitioner is asserting a violation of his Sixth Amendment right to an impartial jury, he has not made out a colorable claim.  Petitioner relies on *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), in arguing that it was improper for the trial judge to permit dismissal of jurors based upon their views of the death penalty without questioning them further.  The standard for determining when a juror may be excluded for cause based upon his or her views of capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Witt*, 469 U.S. at 424 (internal quotation marks omitted).  Petitioner's claim does not involve a trial court's dismissal of a juror based upon a litigated challenge for cause but rather counsel's stipulated dismissal of jurors that counsel determined were unlikely to be able to serve.  Petitioner does not

cite any authority suggesting that *Witt* applies in this context. Because petitioner has not made out a colorable claim for relief, the motion for an evidentiary hearing is denied as to this claim, and the claim is denied on the merits.

**Claim 15(d)**

In claim 15(d), petitioner maintains that the death qualification process was undermined when the trial court and the prosecutor told prospective jurors how to respond to questions about the death penalty and defense counsel failed to object.

As each group of jurors arrived for *voir dire*, the trial court gave an introductory statement. The trial court's remarks varied slightly from group to group, but in essence the trial court stated that the court was "looking for" jurors who did not fall on either extreme with respect to their feelings on capital punishment. The court explained that a fair trial would be undermined by jurors who stated that they always would vote to impose the death penalty or never would vote to impose the death penalty. Petitioner argues that these remarks encouraged prospective jurors to tailor their *voir dire* responses in a manner that prevented defense counsel from getting at their true beliefs. His claim focuses in particular on the *voir dire* of two prospective jurors, Paul Ferdinansen, who eventually was excused, and Mary Hansen, who served on the jury.

The May 2000 Order determined that the claim could be resolved on the record and that no constitutional violation had occurred. The order discussed the *voir dire* of Ferdinansen and Hansen at length, noting that Ferdinansen was honest about his inclination to lean heavily toward imposition of the death penalty even though he acknowledged that was not the answer the court was looking for. Hansen initially stated that she would vote for death and that she could not give petitioner a fair trial, but she became more equivocal after the prosecutor reminded her of the court's initial admonition. The May 2000 Order concluded that nothing in the record suggested that Hansen withheld information during subsequent *voir dire* or did anything other than consider whether she could deliberate based upon the evidence presented at trial. Petitioner's repetition of arguments previously rejected by the court does not undermine that conclusion or establish a basis for granting an evidentiary hearing.

The May 2000 Order did not address petitioner's claim of ineffective assistance of counsel

1    for failing to object.  However, because the remarks of the trial court and the prosecutor did not

2    violate petitioner's constitutional rights, defense counsel's failure to object could not have

3    constituted ineffective assistance.  Accordingly, the motion for an evidentiary hearing is denied as to

4    this claim, and the claim is denied on the merits.

5          **Claim 15(e)**

6          In claim 15(e), petitioner maintains that the trial court and both counsel made comments

7    during *voir dire* that misled jurors regarding the law.  Specifically, he alleges that jurors were led to

8    believe that they had unfettered discretion in reaching a penalty verdict and simply had to vote their

9    consciences; that mitigating circumstances were those that made the crime itself less serious or

10    suggested something "good" about petitioner; that the defense had the burden to prove that

11    mitigating evidence outweighed aggravating evidence; and that they might be required to vote for

12    death in certain circumstances.

13          The May 2000 Order determined that the claim could be resolved on the record and that no

14    constitutional violation had occurred.  The order reviewed constitutional guarantees of due process

15    and a fair trial, but it noted that "[t]he safeguards of juror impartiality, such as *voir dire* and

16    protective instructions from the trial judge, are not infallible; it is virtually impossible to shield

17    jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips*,

18    455 U.S. 209, 217 (1982).  [D]ue process does not require a new trial every time a juror has been

19    placed in a potentially compromising situation." *Ibid.*  While misleading arguments may violate a

20    defendant's right to a fair trial, habeas relief is available for such an error only if it "had substantial

21    and injurious effect or influence in determining the jury's verdict." *Sechrest v. Ignacio*, 549 F.3d

22    789, 807 (2008) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993)).

23          The May 2000 Order concluded that after review of the record it was apparent that the *voir*

24    *dire*, including the remarks complained of by petitioner, was proper, and that even if some remarks

25    were inaccurate, the record did not suggest that the inaccuracies resulted in actual prejudice to

26    petitioner.  The jury was instructed prior to deliberation.  Jurors are presumed to follow the

27    instructions they are given. *Penry v. Johnson*, 532 U.S. 782, 799 (2001).  Petitioner's suggestion

28    that jurors remembered and applied standards articulated during *voir dire* instead of standards set

forth in the jury instructions is unsupported.  The May 2000 Order noted expressly that the Barnes

Declaration relied upon by petitioner was silent on the subject of *voir dire*.  Because petitioner has

not presented a factual or legal basis for reconsidering the prior ruling, the motion for an evidentiary

hearing is denied, and the claim is denied on the merits.

**Claim 15(g)**

In claim 15(g), petitioner maintains that the trial court was inconsistent in ruling on

challenges for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Witt*, 469 U.S.

412.  In *Witherspoon*, the Supreme Court held that "a sentence of death cannot be carried out if the

jury that imposed or recommended it was chosen by excluding veniremen for cause simply because

they voiced general objections to the death penalty or expressed conscientious or religious scruples

against its infliction."  *Witherspoon*, 391 U.S. at 522.  *Witt* clarified that the standard for

determining when a juror may be excluded for cause based upon his or her views of capital

punishment is "whether the juror's views would prevent or substantially impair the performance of

his duties as a juror in accordance with his instructions and his oath."  *Witt*, 469 U.S. at 424 (internal

quotation marks omitted).

The May 2000 Order determined that the claim could be resolved on the record and that no

constitutional violation had occurred.  The order reviewed the *voir dire* of several jurors and

concluded that the record did not support petitioner's claim that the *Witt* standard was applied

improperly.  Petitioner does not explain how an evidentiary hearing would aid in this court's

evaluation of the *voir dire* record; he simply disputes the prior ruling that the record does not

support a finding of error.

Petitioner points out that the May 2000 Order suggested that petitioner would have to show

prejudice from a *Witherspoon/Witt* error in order to prevail, and he argues that an evidentiary

hearing would be necessary to evaluate any such prejudice.  As noted above, it has been determined

that no error occurred.  Moreover, because a *Witherspoon/Witt* error may never be treated as

harmless, *see Gay v. Mississippi*, 481 U.S. 648, 668 (1987), an evaluation of prejudice would be

inappropriate in any event.

Accordingly, the motion for an evidentiary hearing is denied as to this claim, and the claim

United States District Court

For the Northern District of California

is denied on the merits.

**11.    CLAIM 16**

In claim 16, petitioner maintains that prospective jurors were excluded for cause in violation of his constitutional rights.  This claim was raised on direct appeal and was denied on the merits by the California Supreme Court in a reasoned decision.  The May 2000 Order granted summary judgment for respondent on this claim.  Petitioner does not address the claim in his motion for an evidentiary hearing.  The claim is denied on the merits.

**12.    CLAIM 17**

In claim 17, petitioner alleges twelve instances of juror misconduct, set forth in subclaims 17(a)–(l).  These claims were raised in petitioner's first state habeas petition and were denied on the merits in a summary opinion by the California Supreme Court.  The May 2000 Order granted summary judgment for respondent as to claims 17(c), 17(e)–(f), and 17(h)–(l).  Petitioner nonetheless requests an evidentiary hearing as to all twelve of the subclaims.

The cases on juror misconduct "distinguish between introduction of extraneous evidence to the jury, and *ex parte* contacts with a juror that do not include the imparting of any information that might bear on the case."  *United States v. Rosenthal*, 454 F.3d 943, 949 (9th Cir. 2006).  With respect to *ex parte* cases, "[a]ny unauthorized communication between a party or an interested third person and a juror creates a rebuttable presumption of prejudice."  *Rinker v. Napa County*, 724 F.2d 1352, 1354 (9th Cir. 1983).  However, "if an unauthorized communication with a juror is *de minimis*, the defendant must show that the communication could have influenced the verdict before the burden of proof shifts to the prosecution."  *Caliendo v. Warden*, 365 F.3d 691, 696 (9th Cir. 2004).  "A communication is possibly prejudicial, not *de minimis*, if it raises a risk of influencing the verdict."  *Id.* at 697.

"Extraneous-evidence cases involve not only the introduction of evidence *per se* but the submission of extraneous information (e.g., a file or dictionary) to the jury."  *Ibid.*  "The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial."  *Estrada v. Scribner*, 512 F.3d 1227, 1238 (9th Cir. 2008).  The Confrontation Clause is implicated by a juror's communication of extraneous facts to other jurors, because "[t]he

United States District Court
For the Northern District of California

juror in effect becomes an unsworn witness, not subject to confrontation or cross examination." *Ibid.* (internal quotation marks and citation omitted).

"On collateral review, trial errors — such as extraneous information that was considered by the jury — are generally subject to a harmless error analysis, namely, whether the error had substantial and injurious effect or influence in determining the jury's verdict." *Estrada*, 512 F.3d at 1235 (internal quotation marks and citation omitted). When considering the effect of extraneous information on the jury, a court may consider testimony establishing that extraneous evidence was *considered* but may not consider testimony about the subjective *effect* of the evidence on any particular jurors. *Id.* at 1237. The following factors are considered to determine whether a defendant has suffered prejudice from juror misconduct: (1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict. *Ibid.* at 1238.

"An evidentiary hearing is not mandated every time there is an allegation of jury misconduct or bias." *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993). "Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." *Ibid.*

**Claim 17(a)**

In claim 17(a), petitioner maintains that juror Gregory McCarthy consulted, and shared his trial notes with, a paralegal friend during the trial. The declarations submitted by petitioner do not support this claim. McCarthy's declaration, dated November 8, 1996, stated that sometime *after* the trial, McCarthy shared his trial notes with a family friend who was a paralegal (McCarthy Decl. ¶ 7, Pet'r's Exh. 116). As originally typed, McCarthy's declaration stated that he shared the notes with his paralegal friend *during* the trial; however, the word "during" was crossed out and replaced with the handwritten word "after," next to which initials (presumably McCarthy's) were written (*ibid.*). Three other handwritten corrections were made to the declaration in the same manner, all initialed.

United States District Court

For the Northern District of California

The declaration of investigator Jeffrey Hasner, dated December 16, 1997, indicates that he spoke with McCarthy twice in 1990 (Hasner Decl. ¶ 3, Pet'r's Exh. 136).  Hasner recalled that on August 7, 1990, McCarthy said that he had converted four volumes of handwritten jury notes into fifteen pages of computer generated notes; that he had done this during the trial; and that the computer notes were for a friend who was studying law (*ibid.*).  On August 13, 1990, McCarthy told Hasner that he had misunderstood the first discussion, and that the computer notes had not been generated until after the trial (*id.* ¶ 4).  McCarthy stated that he never showed the notes to his friend because she lost interest in the matter (*ibid.*).  McCarthy declined to disclose his friend's name or to sign a second declaration (*ibid.*).

Petitioner argues that the discrepancies in the declarations warrant an evidentiary hearing.  He surmises that "the notes were summarized for Mr. McCarthy by the paralegal during trial, as that is what paralegals generally do" (Pet'r's Reply 127).  Neither of the declarations provides any basis for this speculation.  At most, McCarthy's declaration establishes that he shared his trial notes with a paralegal friend after the trial; it cannot be inferred from the fact that an error was made in the typing of the declaration that McCarthy actually shared the notes during the trial.  At most, Hasner's declaration indicates that McCarthy may have typed up his notes during trial.  The Hasner declaration does not suggest that anyone else typed up the notes, or that anyone else ever saw the notes.  Because petitioner's allegations are wholly unsupported and contradicted by the record evidence, he has failed to make out a colorable claim of jury misconduct.  Accordingly, the motion for an evidentiary hearing is denied as to this claim, and the claim is denied on the merits.

**Claim 17(b)**

In claim 17(b), petitioner asserts that McCarthy and other jurors read newspaper articles about the case prior to the penalty phase, and that an evidentiary hearing is required to determine the extent of the misconduct and whether it was prejudicial.  He relies upon McCarthy's declaration statement that, "After the jury returned a guilty verdict, I read an article in the paper indicating that Mr. Clark was going to have penalty phase trial." (McCarthy Decl. ¶ 11, Pet'r's Exh. 116).  The declaration does not suggest that the newspaper article contained any other facts about the case, that McCarthy was affected by the article in any way, or that McCarthy discussed the article with other

jurors.  Investigator Hasner's declaration regarding his interviews with McCarthy makes no mention of newspaper articles (Pet'r's Exh. 136).  Investigators interviewed at least nine of the jurors and alternates, some more than once, and none of them mentioned reading or discussing newspaper articles about the case during trial (Pet'r's Exhs. 112–115, 136, 167, 184).  This silence with respect to the reading or discussion of newspaper articles suggests strongly that McCarthy's reading of the article referenced in his declaration did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *See Estrada*, 512 F.3d at 1235 (internal quotation marks and citation omitted).  Because petitioner has not presented a colorable claim of jury misconduct, the motion for an evidentiary hearing is denied, and the claim is denied on the merits.

**Claim 17(c)**

In claim 17(c), petitioner contends that jurors went to local shops in an effort to determine the availability of the brand and flavor of the wine cooler that petitioner was carrying on the morning of the murder.  Juror McCarthy stated in his declaration that one weekend during trial, he went to a grocery store and looked for the type of wine cooler in question; when he did not see the type of wine cooler, he "concluded that it would be a very unlikely coincidence if Mr. Clark and the victim happened to drink the same brand of wine cooler" (McCarthy Decl. ¶ 9, Pet'r's Exh. 116).  Investigator Hasner stated in his declaration that McCarthy had told him that he and other jurors had looked for the wine coolers in local convenience stores" (Hasner Decl. ¶ 3, Pet'r's Exh. 136).

The inference that the jurors may have drawn from the unavailability of the wine cooler at local stores was that petitioner likely got the wine cooler from Rosie.  Because petitioner admitted that he got the wine cooler from Rosie, the jurors' exposure to the alleged extrinsic evidence could not have had a substantial or injurious affect or influence on the verdict.  The May 2000 Order granted summary judgment for respondent on this basis.  *See* May 2000 Order 29.  Petitioner has not presented a factual or legal basis for reconsidering that ruling.  The motion for an evidentiary hearing is denied as to this claim, and the claim is denied on the merits.

**Claim 17(d)**

In claim 17(d), petitioner asserts that juror McCarthy substituted his own expertise about epilepsy and blackouts for that of the experts who testified at trial.  During the guilt phase, petitioner

United States District Court
For the Northern District of California

1  presented a defense that he was intoxicated and having a blackout at the time of the murder.  Experts

2  testified on the issues of seizures and blackouts.  At that point, McCarthy notified the trial court that

3  his wife had epilepsy.  The trial court admonished McCarthy to consider only evidence presented

4  during trial and cautioned him against seeking out medical journals, talking with his wife about her

5  epilepsy, or otherwise doing anything to gather information outside of that presented at trial.

6  Neither petitioner nor respondent followed up on the matter.

7        McCarthy made the following statement in his declaration:

8  > There was defense testimony that Mr. Clark suffered from black-outs.  At the time of
> the trial, I held a great amount of knowledge about seizures because I had an

9  > immediate family member with epilepsy.  The defense attorneys did not present
> information to specifically address whether Mr. Clark had seizures.  If he truly had a

10  > long history of suffering from major seizures, the defense would have known about it
> and presented that information to the court and jury.  Therefore, from my personal

11  > experience with seizures, I determined that Mr. Clark could not have suffered from
> any major seizures which highly discredited any argument that Mr. Clark suffered

12  > from black-outs.

13  (McCarthy Decl. ¶ 6, Pet'r's Exh. 116)  Nothing in this statement suggests that McCarthy sought out

14  medical journals, discussed epilepsy with his wife, or otherwise sought out extrinsic evidence.

15  Likewise, nothing in the statement suggests that McCarthy shared his knowledge of epilepsy with

16  other jurors.  "It is expected that jurors will bring their life experiences to bear on the facts of a

17  case."  *Hard v. Burlington Northern R. Co.*, 870 F.2d 1454, 1462 (9th Cir. 1989) (affirming denial of

18  new trial despite allegations that a juror with special knowledge regarding x-ray interpretation tried

19  to use that knowledge to sway other jurors).  Moreover, testimony about the subjective effect of the

20  evidence on any particular jurors may not be considered.  *Estrada*, 512 F.3d at 1237.  Accordingly,

21  McCarthy's statements regarding the subjective effect that his knowledge of epilepsy had on his

22  deliberations may not be considered here.

23       Petitioner has failed to make out a colorable claim of jury misconduct with respect to this

24  claim.  The motion for an evidentiary hearing is denied as to this claim, and the claim is denied on

25  the merits.

26       **Claim 17(e)**

27       In claim 17(e), petitioner alleges that several jurors voted for the death penalty because they

28  believed erroneously that petitioner might be released from prison someday if he were sentenced to

36

United States District Court

For the Northern District of California

life without the possibility of parole.  Juror Frederick Barnes stated in a declaration that he believed, and told other jurors, that petitioner might be released someday if he were not sentenced to death (Barnes Decl. ¶ 5, Pet'r's Exh. 112).  Barnes' belief was based upon news stories he had read or seen on television (*ibid.*).  Other declarations confirmed that jurors discussed whether petitioner could be released if he were sentenced to life without the possibility of parole.  (Pet'r's Exhs. 114, 136).

The May 2000 Order granted summary judgment for respondent on this claim.  The order concluded that the information relayed by juror Barnes was accurate at the time under *People v. Williams*, 30 Cal. 3d 470, 489 (1981), which held that when a jury imposed a sentence of life without the possibility of parole, the trial court retained the authority to dismiss the jury's special circumstance findings in order to make it possible for the defendant to be eligible for parole.[7]  May 2000 Order 30.  The order determined that the information nonetheless should not have been considered by the jury because it was extrinsic material that had not been presented at trial.  *Ibid.* The order concluded that respondent was entitled to summary judgment because no prejudice resulted from the jury's exposure to the extrinsic material.  *Id.* 30–31.

Petitioner argues that the May 2000 Order was in error because *California v. Ramos*, 463 U.S. 992 (1983) — a case not mentioned in the order — was not the law in California at the time of petitioner's trial.  In *Ramos*, the United States Supreme Court addressed the constitutionality of a statutory provision requiring that jurors in capital cases be instructed that the governor had the authority to commute a sentence of life without the possibility of parole to a lesser sentence that included the possibility of parole. The Court concluded that the so-called "Briggs" instruction merely corrected a misconception that a sentence of life without the possibility of parole actually meant that there was no possibility of parole, and thus was not prohibited by the Federal Constitution.  *Id.* at 1009.  The California Supreme Court subsequently prohibited the use of the Briggs instruction on state constitutional grounds; the instruction no longer was given at the time of

---

[7] California trial courts were stripped of that authority by the enactment of California Penal Code Section 1385.1, effective June 6, 1990, which provides that "a judge shall not strike or dismiss any special circumstance which is admitted by a plea of guilty or *nolo contendere* or is found by a jury or court."  Cal. Pen. Code § 1385.1.  Section 1385.1 apparently was enacted as a direct response to *Williams*. *Tapia v. Superior Court*, 53 Cal. 3d 282, 298 n.17 (1991).

United States District Court
For the Northern District of California

petitioner's trial.  *See People v. Ramos*, 37 Cal. 3d 136, 153 (1984).  Petitioner appears to be arguing that because use of the Briggs instruction was prohibited on state law grounds at the time of his trial, the United States Supreme Court's holding that the Briggs instruction did not violate the Federal Constitution may not be applied by analogy to the jury's discussion in this case.  This argument is without merit, as California's determination that the Briggs instruction violated the state constitution has no bearing on the Supreme Court's determination that the instruction did not violate the Federal Constitution.  Although it was not relied upon by the May 2000 Order, and is applicable only by analogy, the Supreme Court's decision in *Ramos* bolsters the May 2000 Order.

Because petitioner has not made out a colorable claim of prejudice and has not presented a factual or legal basis for reconsideration of the court's prior disposition of this claim, the motion for an evidentiary hearing is denied and the claim is denied on the merits.

**Claim 17(f)**

In claim 17(f), petitioner asserts that juror Stella Dickey, the last juror to change her vote to death, did so only because other jurors accused her of holding out because she was a Catholic.  Dickey stated in her declaration that other jurors did accuse her of voting for a life sentence because she was Catholic, and that the accusations upset her (Dickey Decl. ¶ 4, Pet'r's Exh. 114).  The May 2000 Order granted summary judgment as to this claim on the ground that a jury's verdict cannot be impeached by evidence that it was coerced or compromised.  May 2000 Order 31.  Dickey's declaration statements that she felt pressured to vote for death and disrespected by other jurors because of her religion are inadmissible.  *See Estrada*, 512 F.3d at 1237 (declaration statements that jurors felt pressured to vote for second-degree murder and were treated disrespectfully by other jurors were inadmissible in federal habeas proceedings as evidence of subjective mental processes).

Petitioner argues that his claim is not based upon Dickey's statements that she was pressured or disrespected, but upon the fact "that she was subjected to this type of abuse in the first place" (Pet'r's Reply 132).  Petitioner does not explain how to separate the proposed "abuse" claim from a claim based upon Dickey's feelings of coercion, nor does he explain how an internal jury discussion involving religion raises an extrinsic evidence claim.  The cases cited by petitioner addressing interjection of Biblical law or contact with outside religious figures are inapplicable.  Because

petitioner has failed to make out a colorable claim of jury misconduct, and has failed to present any factual or legal basis for reconsideration of the prior disposition of this claim, the motion for an evidentiary hearing is denied and the claim is denied on the merits.

**Claim 17(g)**

In claim 17(g), petitioner alleges that jurors drank alcohol during trial lunch breaks and then returned to their jury duties.  These allegations are based upon investigator Hasner's declaration statements that juror Donald Stoye admitted that he and other jurors had beer or wine with lunch "on at least one occasion" and that juror Luarthur Jones admitted that jurors drank beer or wine during a particular lunch at Manny's Cellar (Hasner Decl. ¶¶ 5–6, Pet'r's Exh. 136).  It is unclear from Hasner's declaration whether the two jurors were describing the same lunch occasion.  Petitioner contends that this evidence of alcohol consumption calls the jury's competency into question.

Petitioner concedes that this claim is barred by *Tanner v. United States*, 483 U.S. 107, 125 (1987) (Pet'r's Reply 132).  Accordingly, the motion for an evidentiary hearing is denied as to this claim and the claim is denied on the merits.

**Claim 17(h)**

In claim 17(h), petitioner asserts that jurors Frederick Barnes, Gregory McCarthy, and Catherine Erickson were biased toward voting for death regardless of mitigating circumstances, and that they concealed their biases during jury selection.  The May 2000 Order (at 32) granted summary judgment for respondent as to this claim after examining all three jurors' declarations and concluding that none of them suggested bias or concealment or warranted an evidentiary hearing.  Petitioner simply disputes that ruling, arguing that the declarations warrant an evidentiary hearing.  Because petitioner has not presented a factual or legal basis for reconsideration of the prior disposition of this claim, the motion for an evidentiary hearing is denied and the claim is denied on the merits.

**Claim 17(i)**

In claim 17(i), petitioner maintains that jurors and prospective jurors saw petitioner in shackles and prison clothing.  In the May 2000 Order, it was determined that the portion of the claim relating to shackling would be addressed in connection with claim 19, which specifically

United States District Court

For the Northern District of California

alleges constitutional violations arising from shackling.  The portion of the claim relating to prison clothing is based on juror McCarthy's declaration, which stated that the bailiff told the jury that petitioner had to wear a red sweater every day "so that he could be easily identified if he ever tried to escape" (McCarthy Decl. ¶ 8, Pet'r's Exh. 116).  According to McCarthy, "[t]he jury then understood that the sweater was for security measures" (*ibid.*).  The May 2000 Order concluded that this evidence did not suggest that the bailiff's statement had any effect on the verdict and granted summary judgment on this basis.  The bailiff's comment was *de minimis*, *see Caliendo*, 365 F.3d at 696, and McCarthy's declaration does not suggest that the jury discussed the matter again or took the bailiff's comment as anything other than information about standard court security measures.  Because petitioner has not presented a factual or legal basis for reconsideration of the May 2000 Order, the motion for an evidentiary hearing is denied and the claim is denied on the merits.

**Claim 17(j)**

In claim 17(j), petitioner maintains that juror McCarthy was biased as a result of his own troubled childhood and that he concealed this bias during *voir dire*.  The May 2000 Order granted summary judgment as to this claim, noting that McCarthy revealed his childhood issues during *voir dire* and concluding that McCarthy's application of his own experiences during deliberations did not make out a claim of misconduct.  May 2000 Order 33.  "It is expected that jurors will bring their life experiences to bear on the facts of a case." *Hard*, 870 F.2d at 1462.  Because petitioner has not presented a factual or legal basis for reconsideration of the prior disposition of this claim, the motion for an evidentiary hearing is denied and the claim is denied on the merits.

**Claim 17(k)**

In claim 17(k), petitioner maintains that juror Barnes improperly consulted with his minister about the case.  In his declaration, Barnes stated that during the guilt phase of the trial, he spoke with his minister about the facts of the case and asked about the propriety of imposing the death penalty (Barnes Decl. ¶ 6, Pet'r's Exh. 112).  The minister told him that based on the circumstances of the case, the death penalty would be appropriate because the Bible says, "an eye for an eye" (*ibid.*).  Petitioner asserts that this evidence warrants an evidentiary hearing.  It is unclear what petitioner believes would be discovered in such a hearing. There is no suggestion that Barnes

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

discussed the minister's advice with other jurors (*ibid.*). Petitioner would not be able to ask Barnes about the subjective effect that the minister's statements had on his deliberations. *Estrada*, 512 F.3d at 1237. The May 2000 Order determined that the contact between Barnes and his minister was insufficient to raise a presumption of a substantial and injurious effect on the verdict and granted summary judgment for respondent. Petitioner simply asks the court to reach a different conclusion based upon the same facts and evidence. Because petitioner has not presented a factual or legal basis for reconsideration of the prior disposition of this claim, the motion for an evidentiary hearing is denied and the claim is denied on the merits.

**Claim 17(l)**

In claim 17(l), petitioner asserts that juror Barnes erroneously considered mitigating evidence of petitioner's troubled childhood to be evidence in aggravation. In his declaration, Barnes stated that after hearing the mitigating evidence regarding petitioner's "horrible childhood," he realized that petitioner "never had a chance and was beyond rehabilitation" such that he "would always be a dangerous person" (Barnes Decl. ¶ 4, Pet'r's Exh. 112). Even if the mitigating evidence were extrinsic to the trial, which it was not, evidence regarding the subjective effect of the evidence upon Barne's mental process would be inadmissible. *See Estrada*, 512 F.3d at 1237. The May 2000 Order granted summary judgment for respondent on this claim. Petitioner has not presented a factual or legal basis for reconsideration of that disposition. Accordingly, the motion for an evidentiary hearing is denied as to this claim and the claim is denied on the merits.

**13.   CLAIM 18**

In claim 18, petitioner alleges denial of his right to be present at critical stages of the trial. This claim was raised in petitioner's second state habeas petition and was denied as untimely and on the merits in a summary opinion by the California Supreme Court.

The United States Supreme Court has recognized a constitutional guarantee that a criminal defendant has a right to be present at every critical stage of the trial. *Rushen v. Spain*, 464 U.S. 114, 117 (1983). However, the right does not extend to proceedings "when presence would be useless, or the benefit but a shadow." *Rice v. Wood*, 77 F.3d 1138, 1140 n.2 (9th Cir. 1996) (internal quotation marks and citation omitted); *see also Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (no right to be

present during hearing to determine competency of prosecution's key witnesses).  "[T]he exclusion of a defendant from a trial proceeding should be considered in light of the whole record." *United States v. Gagnon*, 470 U.S. 522, 526–27 (1985).

Petitioner claims that his right to be present was violated by his exclusion from unreported chambers conferences between the trial judge and counsel; defense counsel's informal inquiry of the trial court how best to proceed with respect to the conflict caused by Brown's representation of prosecution witness Williams; the stipulated dismissals of 124 prospective jurors based upon their questionnaires; and occasions when the jury listened to petitioner's taped statement.  Petitioner has not explained, and it is not apparent from the record, how his presence on these occasions would have benefited the defense.  Because this claim may be resolved on the record, the motion for an evidentiary hearing is denied and the claim is denied on the merits.

**14.    CLAIM 19**

In claim 19, petitioner alleges that he was shackled in the presence of prospective jurors and jurors.  This claim was raised in petitioner's second state habeas petition and was denied on the merits in a summary decision by the California Supreme Court.

"Generally, a criminal defendant has a constitutional right to appear before a jury free of shackles." *Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir. 1989).  Petitioner was housed at the county jail during his trial, and he was handcuffed and/or shackled when he was transported to and from the courtroom.  Once he was seated in the courtroom, his restraints were removed.  On one occasion, petitioner was brought into the courtroom in restraints in front of a panel of forty to fifty prospective jurors.  The trial court admonished the panel not to draw any inferences from petitioner's custodial status; stated that custody was ordinary in capital cases; emphasized that petitioner was presumed innocent; and asked that individuals speak up if the incident might affect their perception of the case.  On several other occasions, jurors saw petitioner handcuffed and/or shackled while he was being transported.  The trial court became aware of some of those occasions, and admonished the jurors in question.  Some jurors were not admonished.

The May 2000 Order determined that these facts warranted an evidentiary hearing under *Rhoden v. Rowland*, 172 F.3d 633 (9th Cir. 1999). May 2000 Order 36.  In *Rhoden*, the Ninth

United States District Court
For the Northern District of California

1    Circuit held that habeas relief was warranted based upon the petitioner's showing that he was

2    shackled "without a proper determination of the need for shackles" "during the entire course of his

3    trial," and that "the shackles were visible from the jury box." *Id.* at 634, 637.  Because *Rhoden* is

4    factually distinguishable from the present case, and because subsequent decisions have clarified the

5    law regarding shackling, the determination that petitioner is entitled to an evidentiary hearing is

6    reconsidered herein *sua sponte*.  *See City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882,

7    888 (9th Cir. 2001) (holding that a district court has the power to reconsider its own interlocutory

8    orders at any time before entry of judgment).

9        In *Ghent v. Woodford*, 279 F.3d 1121 (9th Cir. 2002), the Ninth Circuit held that in order for

10   a petitioner to prevail on a due process claim based upon shackling, "a court must find that the

11   defendant was indeed physically restrained in the presence of the jury, that the shackling was seen

12   by the jury, and that the physical restraint was not justified by state interests." *Id.* at 1132.  "Then,

13   in order for the unjustified shackling to rise to the level of a constitutional error, the defendant must

14   make a showing that he suffered prejudice as a result." *Ibid.*  If a constitutional error is found, the

15   court must determine whether the error had a "substantial and injurious effect" on the jury's verdict.

16   *Id.* n.9.

17       As an initial matter, it would seem to be virtually impossible for petitioner to show that the

18   use of restraints while transporting a defendant in a capital murder case from the county jail to the

19   courtroom was "not justified by state interests."  The Supreme Court has recognized that "the

20   interest in courtroom security" is an "essential" state interest.  *Deck v. Missouri*, 544 U.S. 622, 624

21   (2005).  At least one district court has characterized shackling during transport as objectively

22   "reasonable and ordinary" when the defendant is charged with capital murder.  *See Frye v. Warden*,

23   No. 2:99-cv-0628 LKK CKD, 2013 WL 6271928, at *79 (E.D. Cal. Dec. 4, 2013) (noting that "[t]he

24   shackling occurring outside the courtroom could not have come as any surprise to the jury").

25       Even if petitioner could establish that shackling him during transport was not justified by

26   state interests, the Ninth Circuit has held that jurors' brief glimpses of a defendant in shackles or

27   handcuffs are harmless, and do not rise to the level of a due process violation.  *See Ghent,* 279 F.3d

28   at 1133 (no actual prejudice shown when "a few jurors at most glimpsed [the petitioner] in shackles

in the hallway as he was entering the courtroom"); *United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995) ("a jury's brief or inadvertent glimpse of a defendant in physical restraints is not inherently or presumptively prejudicial to a defendant").

Petitioner suggests that it is unclear whether jurors viewed him in restraints only during transport (Pet'r's Reply 150). This vague suggestion is insufficient to warrant an evidentiary hearing, particularly absent record evidence that petitioner was restrained during trial proceedings. Petitioner also suggests that the effect of the shackling must be considered in conjunction with the effect of the red sweater that he was required to wear. The red sweater is the subject of claim 17(i) and is addressed above. The fact that some jurors saw petitioner both in a red sweater and in restraints on brief occasions does not change the analysis herein.

Because petitioner has not presented a colorable claim for relief, an evidentiary hearing is not warranted with respect to claim 19, and the claim is denied on the merits.

**15.   CLAIMS 20–21**

In claims 20 and 21, petitioner maintains that the prosecution committed misconduct by failing to disclose exculpatory information (claim 20) and by using false testimony (claim 21). These claims were raised in petitioner's second state habeas petition and were denied as untimely and on the merits in a summary decision of the California Supreme Court.

"Review for prosecutorial misconduct claims on a writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Jones v. Ryan*, 691 F.3d 1093, 1102 (9th Cir. 2012). For a petitioner to obtain habeas relief, "the alleged misconduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Ibid.* (internal quotation marks and citation omitted).

**Suppression of Exculpatory Information**

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This holding has been extended to apply even when there has been no defense request, *United States v. Agurs*, 427 U.S. 97, 110–11 (1976), and to encompasses impeachment evidence as well as

exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 682.  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Ibid.*  "[T]here is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  *Stickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Petitioner alleges that the prosecution failed to disclose jail records, Officer Manda's report, and information regarding defense counsel's prior representation of potential defense witnesses. The first two categories of evidence are discussed in connection with claim 4, *supra*, and for the reasons discussed therein there is no reasonable probability that the alleged suppression of these materials affected the outcome of the trial.  With respect to the third category, petitioner alleges that the prosecution failed to disclose records that would have revealed the extent of defense counsel's prior representation and prosecution of potential and actual witnesses.  The alleged conflict resulting from those prior representations are addressed in connection with claim 6, *supra*.  For the reasons discussed therein, the alleged conflicts did not adversely affect defense counsel's performance. Thus there is no reasonable probability that concealment of those conflicts affected the outcome of the trial.  Moreover, the conflicts in question were known to defense counsel and thus were not concealed from the defense.

Petitioner alleges that the prosecution failed to disclose evidence that Williams and Smith got deals for their cooperation, that Dino provided the prosecutor with information about petitioner's daily drug use, and that Boyd's house was a location where drugs were sold.  The record does not support these allegations and, even if the prosecution failed to disclose any of these facts, there is no reasonable probability that the outcome of the trial would have been affected given the substantial amount of evidence linking petitioner to the crimes.

**Use of False Testimony**

"A prosecutor's knowing use of false testimony to get a conviction violates due process." *Jones*, 691 F.3d at 1102.  "To prevail on a due process claim based on the presentation of false

United States District Court

For the Northern District of California

1  evidence, a petitioner must show that (1) the testimony (or evidence) was actually false, (2) the

2  prosecution knew or should have known that the testimony was actually false, and (3) . . . the false

3  testimony was material." *Ibid.* (internal quotation marks and citation omitted).  The question to be

4  asked when evaluating a false testimony claim "is not whether the defendant would more likely than

5  not have received a different verdict if the false testimony had not been presented, but whether the

6  defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

7  *Ibid.* (internal quotation marks and citation omitted).

8      Petitioner alleges that the prosecution presented the false testimony of Williams, Smith,

9  Dino, and Boyd, to make it seem as though petitioner was not particularly intoxicated on the night

10  of the murder.  Petitioner submits declarations from these witnesses, all of which describe

11  petitioner's intoxication in much stronger terms than their testimony.  *See* Williams Decl. ¶¶ 3–5,

12  Pet'r's Exh. 180; Smith Decl. ¶¶ 5–7, 9–11, Pet'r's Exh. 15; Dino Decl. ¶¶ 3–11, Pet'r's Exh. 10;

13  Boyd Decl. ¶¶ 4–7, Pet'r's Exh. 4.  The fact that these witnesses have submitted declarations telling

14  a different story from that they told on the stand at trial does not raise a reasonable probability that

15  they lied on the stand; they could be lying now, or the discrepancies could be the result of faded

16  memory.  Moreover, if the witnesses were lying at trial, the record does not show that the

17  prosecution knew it.  Finally, there is no reasonable probability that these witnesses' testimony

18  would have altered the outcome of the trial given other evidence of petitioner's drug use that was

19  presented.

20      Because petitioner has failed to present a colorable claim of prosecutorial misconduct, the

21  motion for an evidentiary hearing is denied as to these claims and the claims are denied on the

22  merits.

23  **16.   CLAIM 22**

24      In claim 22, petitioner alleges violation of his privilege against self-incrimination,

25  specifically, use at trial of statements that petitioner made to Mayland and that Mayland revealed

26  during the suppression hearing.  This claim was raised on direct appeal and was addressed by the

27  California Supreme Court in a reasoned decision.

28      This claim was litigated extensively in the trial court:

46

1  After extensive briefing and argument on this subject, the trial court concluded that
2  the prosecutor could use defendant's statements to Mayland to impeach the
   defendant's experts.  Specifically, the trial court ruled that the "tendering of the
3  psychiatric defense" waived any Fifth and Sixth Amendment privileges.  The trial
   court also ruled that defendant had waived the statutory attorney-client and
4  psychotherapist-patient privileges.

5  *Clark*, 5 Cal. 4th at 1005.  On appeal, petitioner did not dispute that by tendering his mental defense,

6  he had waived the applicable psychotherapist-patient privilege.  *Ibid.*  The California Supreme Court

7  determined that Mayland's testimony at the suppression hearing also effected a waiver of

8  petitioner's attorney-client privilege.  *Id.* at 1005–06.  The Court held that "[b]y calling Mayland to

9  the stand during the suppression hearing, defendant manifested an intent that his communications

10 with Mayland be revealed to third parties and that the attorney-client privilege be waived."  *Ibid.*  In

11 rejecting petitioner's argument that he was coerced because he was forced to sacrifice one

12 constitutional right (the Sixth Amendment right to counsel) in order to vindicate another

13 constitutional right in litigating the suppression motion (the Fifth Amendment privilege against self-

14 incrimination), the Court held:

15    Assuming without deciding that the waiver of the attorney-client privilege is of
       constitutional dimensions pursuant to the Sixth Amendment and its state counterpart,
16    we are not faced in this case with an intolerable conflict between constitutional
       rights.  Defendant was not compelled to waive the attorney-client privilege shielding
17    his revelations to Mayland in order to support his suppression motion.  As illustrated
       by the fact that mental health experts other than Mayland testified at trial, experts,
18    who were not part of the defense team, could have been readied and called to testify
       during the pretrial hearing, thus obviating the asserted constitutional dilemma.  The
19    presentation of Mayland's testimony was a tactical choice that was not impermissibly
       coerced or compelled
20

21 *Id.* at 1007.  While the state court's decision is not entitled to deference on mixed questions of fact

22 and law or pure questions of law, this portion of the opinion aptly describes the conclusions reached

23 herein on *de novo* review.

24    Petitioner also contends that he was denied due process during the record correction

25 proceeding initiated by appellate counsel.  Appellate counsel requested a settled statement

26 memorializing the trial court's alleged assurance at an unreported conference that Mayland's

27 testimony would not be used at trial.  The trial court considered and denied that motion.  The fact

28 that the trial court ruled against petitioner does not constitute a deprivation of due process.

United States District Court
For the Northern District of California

Because this claim may be determined on the record, and because it is without merit, the motion for an evidentiary hearing is denied and the claim is denied on the merits.

**17.    CLAIM 23**

In claim 23, petitioner alleges prosecutorial misconduct.  This claim was raised on direct appeal and was addressed by the California Supreme Court in a reasoned decision.  The May 2000 Order (at 36–41) granted summary judgment for respondent as to this claim.  Petitioner does not address the claim in his motion for an evidentiary hearing.  The claim is denied on the merits.

**18.    CLAIM 24**

In claim 24, petitioner challenges the use of tape-recorded statements made to investigators who elicited those statements while seeking a handwriting exemplar.  This claim was raised on direct appeal and was addressed by the California Supreme Court in a reasoned decision.  The May 2000 Order (at 41–45) granted summary judgment for respondent as to this claim.  Petitioner does not address the claim in his motion for an evidentiary hearing.  The claim is denied on the merits.

**19.    CLAIM 25**

In claim 25, petitioner maintains that he was denied his right to allocution.  This claim was raised on direct appeal and was addressed by the California Supreme Court in a reasoned decision.  The May 2000 Order granted summary judgment for respondent as to this claim.  May 2000 Order 45–46.  Petitioner does not address the claim in his motion for an evidentiary hearing.  The claim is denied on the merits.

**20.    CLAIM 26**

In claim 26, petitioner alleges errors with respect to several jury instructions.  This claim was raised on direct appeal and was addressed by the California Supreme Court in a reasoned decision.  The May 2000 Order (at 46–52) granted summary judgment for respondent as to this claim.  Petitioner does not address the claim in his motion for an evidentiary hearing.  The claim is denied on the merits.

**21.    CLAIM 27**

In claim 27, petitioner alleges a variety of instructional deficiencies that he claims rendered his sentencing proceeding arbitrary and capricious.  This claim was raised on direct appeal and was

addressed by the California Supreme Court in a reasoned decision.  The May 2000 Order (at 57–59) granted summary judgment for respondent as to this claim.  Petitioner seeks an evidentiary hearing with respect to his contention that the 1978 death penalty statute under which he was sentenced is unconstitutional because it does not adequately narrow the class of persons eligible for the death penalty.  The Ninth Circuit has held expressly that "[t]he 1978 death penalty statute . . . narrows the class of persons eligible for the death penalty at both the guilt and the penalty phases."  *Mayfield v. Woodford*, 270 F.3d 915, 924 (9th Cir. 2001).  Accordingly, the motion for an evidentiary hearing is denied as to this claim, and the claim is denied on the merits.

Petitioner also requests an evidentiary hearing with respect to his contention that trial counsel was ineffective for failing to request proper instructions regarding a number of issues.  The May 2000 Order (at 53) struck this aspect of claim 27 as duplicative of petitioner's other claims of ineffective assistance of counsel.

**22.   CLAIM 28**

In claim 28, petitioner maintains that the death judgment imposed on him is unconstitutionally disproportionate.  This claim was raised on direct appeal and was addressed by the California Supreme Court in a reasoned decision.  The May 2000 Order (at 59–60) granted summary judgment for respondent as to this claim.  Petitioner does not address the claim in his motion for an evidentiary hearing.  The claim is denied on the merits.

**23.   CLAIM 29**

In claim 29, petitioner maintains that he received ineffective assistance of appellate counsel.  This claim was raised in petitioner's second state habeas petition and was denied on the merits in a summary opinion by the California Supreme Court.  Petitioner does not seek an evidentiary hearing with respect to this claim.

Although the right to effective assistance of appellate counsel is grounded in the Fourteenth Amendment rather than the Sixth Amendment, a claim that appellate counsel was deficient is reviewed under the standards set forth in *Strickland*.  *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).  Petitioner alleges that appellate counsel was deficient in failing to ensure that there was a complete record for review on appeal, and specifically for failing to request that the record be

49

1    corrected to include an account of what happened at unreported trial conferences in chambers.

2    Appellate counsel did move for a settled record statement with respect to the unreported conference

3    at which defense counsel believed it had been agreed that Mayland's suppression hearing testimony

4    would not be used at trial.  All parties to that conference had different recollections; the trial court

5    considered and rejected the defense version of events.

6         Petitioner also alleges that appellate counsel failed to raise all available claims, and in

7    particular all aspects of a claim for ineffective assistance of trial counsel.  The record reflects that

8    appellate counsel raised numerous claims, including a claim of ineffective assistance of trial

9    counsel.  Although petitioner asserts that appellate counsel could have and should have raised other

10   claims as well, it cannot be said that appellate counsel's choice as to what claims to assert was

11   objectively unreasonable.  Accordingly, this claim is denied on the merits.

12   **24.    CLAIM 30**

13        In claim 30, petitioner maintains that the California Supreme Court deprived him of

14   meaningful appellate review.  This claim was raised in petitioner's second state habeas petition and

15   was denied as untimely and on the merits in a summary opinion of the California Supreme Court.

16   The May 2000 Order (at 60) granted summary judgment for respondent as to this claim.  Petitioner

17   does not address the claim in his motion for an evidentiary hearing.  The claim is denied on the

18   merits.

19   **25.    CLAIM 31**

20        In claim 31, petitioner maintains that he is actually innocent.  This claim was raised in his

21   second state habeas petition and was denied on the merits in a summary opinion by the California

22   Supreme Court.

23        The United States Supreme Court expressly has left open the question of whether a

24   freestanding claim of actual innocence is cognizable on federal habeas review.  *See McQuiggin v.*

25   *Perkins*, 133 S.Ct. 1924, 1931 (2013) ("We have not resolved whether a prisoner may be entitled to

26   habeas relief based on a freestanding claim of actual innocence.").  Assuming without deciding that

27   "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution

28   of a defendant unconstitutional," the Court has held that "the threshold showing for such an

United States District Court

For the Northern District of California

assumed right would necessarily be extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1993). The Ninth Circuit has held that "a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger v. Stewart*, 132 F.3d 463, 476 (9ᵗʰ Cir. 1997). The court concluded that "[i]n light of the presumption of guilt that attaches after a constitutionally valid conviction, 'it is fair to place on [a petitioner asserting a *Herrera* claim] the burden of proving his innocence, not just raising doubt about his guilt.'" *Id.* at 477 (quoting *Herrera*, 506 U.S. at 443 (Blackmun, J., dissenting) (alteration in original).

Petitioner asserts that the following evidence establishes that Dino killed Rosie:  petitioner's lack of violent record; Dino's history of violence; Dino's lies about his whereabouts at the time of the murder; petitioner's failure to recollect the events; the state criminalist's improper altering of the data to indicate that the semen found on Rosie matched petitioner's blood type; the state's destruction of samples from petitioner from around the time of the crime (Traverse 407–08).

This material does not make out a colorable claim of innocence. At most, the evidence might raise faint doubt about petitioner's guilt. That is insufficient under the standard set forth in *Carriger*. Accordingly, the motion for an evidentiary hearing is denied as to this claim, and the claim is denied on the merits.

**26.    CLAIM 32**

In claim 32, petitioner maintains that California's death penalty statute, as interpreted by the California Supreme Court and applied to him, deprived him of due process and a reliable penalty determination. Specifically, petitioner asserts that California's statutory scheme fails to:  assign a burden of proof at the sentencing phase; require that the jury find aggravating factors unanimously; or require that the jury find aggravating factors beyond a reasonable doubt. Petitioner claims that these protections are required under *Ring v. Arizona*, 536 U.S. 584 (2002), *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Jones v. United States*, 526 U.S. 227 (1999). This claim was raised in petitioner's third state habeas petition and was denied summarily by the California Supreme Court.

*Ring*, *Apprendi*, and *Jones* require that a jury, rather than a judge, find facts essential to the imposition of a sentence. *See Ring*, 536 U.S. at 588–89 (precluding judicial determination of

51

United States District Court

For the Northern District of California

1  aggravating factors necessary to impose the death penalty); *Apprendi*, 530 U.S. at 478, 494

2  (precluding judicial findings of factors that raised the statutory maximum sentence ); *Jones*, 526

3  U.S. at 232 (precluding judicial categorization of harm to the victim when categorization affected

4  the sentence).  None of these decisions requires the protections that petitioner claims are missing

5  from the California scheme.  Even if they did, however, petitioner's claim would be barred by

6  *Teague*, as *Ring*, *Apprendi*, and *Jones* were decided after his conviction became final.  *See Schriro*

7  *v. Summerlin*, 542 U.S. 348, 358 (2004) (*Teague* bars retroactive application of *Ring* on federal

8  habeas review); *Jones v. Smith*, 231 F.3d 1227, 1238 (9th Cir. 2000) (*Teague* bars retroactive

9  application of *Apprendi* on federal habeas review).  The claim is denied.

10  **27.   CLAIM 33**

11         In claim 33, petitioner reiterates his contention, set forth in claim 27, that the 1978 death

12  penalty statute under which he was sentenced is unconstitutional because it does not adequately

13  narrow the class of persons eligible for the death penalty.  This claim was raised in petitioner's third

14  state habeas petition and was denied summarily by the California Supreme Court.  Petitioner

15  acknowledges that this claim is presented in claim 27, but he asserts that claim 33 "expounds" upon

16  the claim as articulated in claim 27 (Pet'r's Memorandum of Points & Authorities in Support of

17  Traverse at 412).  As is discussed above in connection with claim 27, the Ninth Circuit has held

18  expressly that "[t]he 1978 death penalty statute . . . narrows the class of persons eligible for the

19  death penalty at both the guilt and the penalty phases."  *Mayfield*, 270 F.3d at 924.  Petitioner does

20  not seek an evidentiary hearing with respect to this claim.  The claim is denied on the merits.

21  **28.   CLAIM 34**

22         In claim 34, petitioner maintains that his lengthy tenure on death row constitutes cruel and

23  unusual punishment in violation of the Eighth Amendment.  This type of claim is referred to as a

24  "*Lackey*" claim after *Lackey v. Texas*, 514 U.S. 1045 (1995).  There are two types of *Lackey* claims.

25  "First, the prisoner might argue that confining a person on death row for such an extended period of

26  time itself constitutes cruel and unusual punishment."  *Ceja v. Stewart*, 134 F.3d 1368, 1376 (9th Cir.

27  1998).  "Second, the prisoner might argue that, after a sufficient amount of time has elapsed since

28  the defendant's conviction, the execution would violate the Eighth Amendment because the ability

United States District Court

For the Northern District of California

1    of the state to exact retribution and to deter other serious offenses by actually carrying out the

2    defendant's execution is drastically diminished." *Ibid.*  Petitioner asserts both types of *Lackey*

3    claims.

4          The United States Supreme Court has never recognized a *Lackey* claim as viable under the

5    Eighth Amendment.  *See Smith v. Mahoney*, 611 F.3d 978, 998 (9th Cir. 2010).  The Ninth Circuit

6    has held that as a result, recognition of a *Lackey* claim on habeas review is barred by *Teague*.  *Id.* at

7    998–99.  Petitioner does not request an evidentiary hearing on this claim.  The claim is denied.

8    **29.    CLAIM 35**

9          In claim 35, petitioner maintains that his sentence of death is illegal and unconstitutional

10   because execution by lethal injection — the method by which the State of California plans to

11   execute him — constitutes cruel and unusual punishment in violation of the Eighth Amendment.

12   This claim was raised in petitioner's third state habeas petition and was denied summarily by the

13   California Supreme Court.

14         To the extent that petitioner challenges the use of lethal injection generally, his claim is

15   precluded by the United States Supreme Court's decision in *Baze v. Rees*, 553 U.S. 35 (2008).  In

16   *Baze*, the Court addressed an Eighth Amendment challenge to Kentucky's lethal injection protocol.

17   The Court noted that thirty-six states use lethal injection for capital punishment and that at least

18   thirty states, including Kentucky, use the same combination of three drugs:  sodium thiopental,

19   pancuronium bromide, and potassium chloride.[8]  *Id.* at 44.  The first drug, sodium thiopental, a

20   barbiturate, induces "a deep comalike unconsciousness"; the second drug, pancuronium bromide, is

21   a paralytic that inhibits all movement and, by paralyzing the diaphragm, stops respiration; and the

22   third drug, potassium chloride, induces cardiac arrest.  *Ibid.*  "The proper administration of the first

23   drug insures that the prisoner does not experience any pain associated with the paralysis and cardiac

24   arrest caused by the second and third drugs."  *Ibid.*  The Court held that this protocol was not

25   rendered cruel and unusual because there was a risk that the first drug might not be administered

26   properly, which would result in severe pain when the second and third drugs were administered.  *Id.*

27

28   ---

[8] California historically has used a similar three-drug protocol.  *See Morales v. Cate*, 757 F. Supp.
2d 961, 962 (N.D. Cal. 2010).

United States District Court
For the Northern District of California

1   at 55.  The Court also held that Kentucky's protocol was not rendered cruel and unusual by the

2   state's refusal to modify its protocol to use only a barbiturate (to ensure painless death) or to omit

3   the paralytic pancuronium bromide (to ensure that pain responses were not merely masked).  *Id.* at

4   58.

5          To the extent that petitioner challenges California's lethal injection protocol in particular, the

6   claim is unripe.  The protocol in place when the fifth amended petition was filed subsequently was

7   revised.  *See* Cal. Code Regs. tit. 15, § 3349 *et seq.*; *see also Payton v. Cullen*, 658 F.3d 890, 893

8   n.1 (9th Cir. 2011) ("The California Office of Administrative Law approved a revised protocol on

9   July 30, 2010, with an effective date of August 29, 2010.").  The California Court of Appeal has

10  held that the revised protocol is invalid and has permanently enjoined the execution of any inmate

11  by lethal injection unless and until new regulations governing lethal injection are promulgated.  *See*

12  *Sims v. Dep't of Corrections and Rehabilitation*, 216 Cal. App. 4th 1059, 1084 (2013).  Because

13  California does not have a lethal injection protocol in place at this time, petitioner's claim is subject

14  to dismissal for lack of ripeness.  *See Payton*, 658 F.3d at 893 (district court should have dismissed

15  habeas claim challenging lethal injection as unripe because California had no protocol in place at

16  time of ruling).  Accordingly, the claim will be denied without prejudice to a challenge to a future

17  lethal injection protocol, if appropriate.  This order expresses "no opinion as to whether this should

18  be by way of habeas relief or through an action under 42 U.S.C. 1983."  *See id.* n.2.

19  **30.     CLAIM 36**

20         In claim 36, petitioner maintains that the cumulative effect of the errors alleged in his fifth

21  amended petition resulted in an unconstitutional conviction and sentence.  Because none of the

22  errors alleged in the fifth amended petitioner warrant relief, as discussed *supra*, no evidentiary

23  hearing is necessary with respect to this claim, and the claim is denied on the merits.

                                          **CONCLUSION**

25         For the foregoing reasons, petitioner's motion for an evidentiary hearing is **DENIED** as to all

26  claims.  The prior determination that an evidentiary hearing is necessary as to claim 19 is

27  reconsidered *sua sponte*, and upon reconsideration an evidentiary hearing is **DENIED** as to claim 19.

28  The fifth amended petition for writ of habeas corpus is **DENIED** as to all claims.

United States District Court
For the Northern District of California

1    Rule 11(a) of the Rules Governing Section 2254 Cases requires a district court to rule on

2    whether a petitioner is entitled to a certificate of appealability in the same order in which the petition

3    is denied.  Petitioner has not made a substantial showing that his claims amounted to a denial of his

4    constitutional rights or demonstrated that a reasonable jurist would find the denial of his claims to

5    be debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Consequently, no

6    certificate of appealability is warranted in this case.

7

8         **IT IS SO ORDERED.**

9

10   Dated:  March 31, 2014.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28