United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD DEAN CLARK,<br><br>Petitioner,<br><br>v.<br><br>RON BROOMFIELD, Acting Warden, San Quentin State Prison,<br><br>Respondent. | Case No. 97-cv-20618-WHO<br><br>**<u>DEATH PENALTY CASE</u>**<br><br>**ORDER ON REMAND** |

## INTRODUCTION

This habeas corpus matter is on remand for application of the decision in *Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017), to a juror misconduct claim that was previously denied on its merits. *See Clark v. Chappell*, 936 F.3d 944, 972-73 (9th Cir. 2019) (per curiam). I conclude that, on the current record, petitioner Richard Dean Clark has established presumptive prejudice to the jury's penalty phase verdict and that respondent has not shown that such error was harmless. I direct the parties to submit further briefing in accordance with this Order on whether an evidentiary hearing is appropriate or efficacious in resolving petitioner's juror misconduct claim.

## BACKGROUND

Clark was convicted of the murder and rape of fifteen-year-old Rosie Grover in Ukiah, California, in July 1985. *People v. Clark*, 5 Cal.4th 950, 971 (1993). The jury found true three charged special circumstances: i) murder during the course of rape; ii) intentional infliction of bodily injury; and iii) use of a deadly weapon during the murder. *Id.* After the penalty phase, the jury returned a death verdict and the trial court entered judgment accordingly. *Id.*

During post-conviction proceedings in 1996, Clark discovered evidence that a juror, Frederick Barnes, improperly consulted with his minister during trial, and that this consultation could have influenced the juror's deliberations and votes at trial. Clark presented this claim of

juror misconduct, supported by a signed declaration from Barnes, to the Supreme Court of California ("CSC") in a petition for habeas corpus relief in 1997.  Clark requested that the CSC enter an order to show cause, permit him to engage discovery, and, ultimately, afford an evidentiary hearing on the claim.

The CSC asked for informal briefing from the State.  Counsel for the State and an investigator, Randall Wong, visited Barnes to discuss his declaration.  The State submitted a declaration from Wong in support of its informal briefing in the CSC.  While Wong's declaration undermined or conflicted with some of the statements in Barnes's declaration, the State did not obtain a subsequent declaration from Barnes.  The CSC summarily denied the claim on the merits in 1998.

Clark then included the claim in his Third Amended Petition in this action, filed on October 5, 1998, and requested an evidentiary hearing in support of the claim.  Respondent opposed the request, citing the Wong declaration to refute the salient parts of the Barnes declaration.  Clark objected generally to the admissibility of the Wong Declaration as hearsay and to discrete portions of the declaration pursuant to the no-impeachment rule codified at Rule 606(b)(1) of the Federal Rules of Evidence.  Without affording discovery or an evidentiary hearing, this court, the Hon. James Ware presiding, granted respondent summary judgment on this claim.  Dkt. No. 219 at 34.  Judge Ware disclaimed any reliance upon the Wong declaration in his ruling and concluded that Clark had not shown that Barnes's contact with his minister was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).  Although Judge Ware granted summary judgment for respondent, he permitted Clark to revive the issue by way of a motion for evidentiary hearing.

Clark filed the operative Fifth Amended Petition, which again raised his Barnes juror misconduct claim, on September 22, 2009.  Dkt. No. 451.  He later filed a renewed motion for evidentiary hearing in which he again argued that he should receive an evidentiary hearing on the Barnes juror misconduct claim.  Dkt. No. 507 at 194-96.  The Hon. William H. Alsup[1] denied that

---

[1] Judge Alsup took over the case after Judge Ware retired.  When Judge Alsup assumed senior status, the case was reassigned to me.

1    motion, concluding that Clark failed to "present[] a factual or legal basis for reconsideration of the

2    prior disposition of this claim[,]" and that, consequently, "the motion for an evidentiary hearing is

3    denied and the claim is denied on the merits." Dkt. No. 558 at 41.

4         In pertinent part, the United States Court of Appeals for the Ninth Circuit vacated and

5    remanded with instructions to apply its intervening decision in *Godoy* to Clark's Barnes claim.

6    *Clark*, 936 F.3d at 971-72.  The court of appeals did not opine whether Clark should be afforded

7    an evidentiary hearing and did not reach any of the evidentiary issues raised by the parties,

8    including the admissibility of the Wong declaration, leaving those issues to be decided on remand.

9    *Id*.

10                                  **LEGAL STANDARD**

11        Because Clark initiated these habeas proceedings by filing his original petition prior to the

12   enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), pre-

13   AEDPA standards govern resolution of the petition, including the lone claim at issue on remand.

14   *Clark*, 936 F.3d at 966.  "Under pre-AEDPA standards, both questions of law and mixed questions

15   of law and fact are subject to de novo review, which means that a federal habeas court owes no

16   deference to a state court's resolution of such questions." *Id.* (citations omitted).  Freed from

17   AEDPA's required state court deference and its corresponding constraints on federal court record

18   development, *see Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011), I am to apply the *Godoy*

19   decision in a de novo review of the merits of Clark's Barnes juror misconduct claim.

20        It has long been the rule that, even where constitutional error occurred in a state criminal

21   trial, federal habeas relief may be granted only if such error had a "substantial and injurious effect

22   or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 638 (internal quotation and

23   citation omitted).  Under this standard, habeas petitioners "may obtain plenary review of their

24   constitutional claims, but they are not entitled to habeas relief based on trial error unless they can

25   establish that it resulted in actual prejudice."  *Id.* at 637 (citation and internal quotation omitted).

26        As recounted above, the conclusion that Clark could not show actual prejudice under

27   *Brecht* was the basis for the previous denial of his Barnes juror misconduct claim.  While the court

28   of appeals expressly declined to find error in this ruling, *see Clark*, 936 F.3d at 972, it nevertheless

                                            3

vacated and remanded with instruction to apply *Godoy*'s analytical framework.  As I will  discuss

below, *Godoy* employs a harmless error test distinct from, and less demanding than, that of *Brecht*.

In his post-remand brief, respondent acknowledges this analytical distinction and recognizes that

*Godoy*, rather than *Brecht*, controls the determination of whether any constitutional error relating

to the Barnes claim was harmless.  Dkt. No. 583 at 3.  Accordingly, I will apply the *Godoy*

framework with no further inquiry under *Brecht*.  *See Clark*, 936 F.3d at 971-72 (recognizing that

the *Godoy* test constitutes a "new legal principle" or "new standard" distinct from this court's

prior analysis under *Brecht*).

## DISCUSSION

### I.    Juror misconduct and *Godoy*.

"One of the most fundamental rights in our system of criminal justice is the right to trial

before an impartial jury."  *Godoy*, 861 F.3d at 958.  "In the constitutional sense, trial by jury in a

criminal case necessarily implies at the very least that the evidence developed against a defendant

shall come from the witness stand in a public courtroom where there is full judicial protection of

the defendant's right of confrontation, of cross-examination, and of counsel."  *Turner v. State of

Louisiana*, 379 U.S. 466, 472-73 (1965) (internal quotation omitted).  A "critical safeguard" in

ensuring the Constitution's fair trial guarantee is "protecting the jury against improper influence

from outside parties." *Godoy*, 861 F.3d at 958.  "[W]hen faced with allegations of improper

contact between a juror and an outside party, courts apply a settled two-step framework" derived

from the decisions of the Supreme Court of the United States in *Mattox v. United States*, 146 U.S.

140 (1892), and *Remmer v. United States*, 347 U.S. 227 (1954).  *Id.* at 959.

It is helpful to briefly review the doctrinal foundation for this framework before applying it

to Clark's claim.  In *Mattox*, the Court reversed a district court's order denying a motion for a new

trial that was based upon juror affidavits establishing that the bailiff charged with securing the jury

made prejudicial statements to jurors about the defendant's criminal history and culpability for the

crimes for which he was charged.  146 U.S. at 143-44.  The affidavits also recounted that a

newspaper article with prejudicial commentary about the case was read to the jury during

deliberations.  *Id.*  The Court articulated the following rule for examining extrajudicial influences

4

on a jury:

> It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. . . . Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.

*Id.* at 149-50.  Hence, in establishing the early contours of a framework for examining claims of improper jury influence or contact, the Court announced at least two important criteria: where improper contact with a juror is alleged, the extrajudicial contact or communication must at least be "possibly prejudicial" and, furthermore, such claims are subject to a harmlessness inquiry.

In *Remmer*, the Court again considered the denial of a motion for new trial based upon a claim of improper extrajudicial contact involving a juror.  The defendant learned, after trial, that the jury foreman was approached at some point by an unknown person offering pecuniary gain to the juror in exchange for a verdict favorable to the defendant.  347 U.S. at 228.  When the juror first alerted the judge to this contact, the judge conferred with the prosecution and ordered the F.B.I. to investigate the allegation and prepare a report.  *Id.*  The report was made available only to the judge and the prosecution, with all involved apparently agreeing that the offer to the juror was made in jest and that, therefore, no further inquiry was required.  *Id.*  The defense learned about the incident and the F.B.I. investigation in media reports after trial and moved for a new trial.  *Id.*  The judge declined to hold a hearing on the defendant's claim that he suffered prejudice and denied the motion for new trial.  *Id.* at 228-29.  Refining its *Mattox* holding, the Court held that, "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial[,]" but that such "presumption is not conclusive" and the Government is required to "establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."  *Id.* at 229 (citing *Mattox*, 146 U.S. at 148-50).

Synthesizing these two decisions, *Godoy* articulates the *Mattox-Remmer* framework as follows:

> At step one, the court asks whether the contact was "possibly prejudicial," meaning it had a "tendency" to be "injurious to the defendant."  If so, the contact is "deemed presumptively prejudicial" and the court proceeds to step two, where the "burden rests heavily upon the [state] to establish" the contact was, in fact, "harmless."

United States District Court
Northern District of California

861 F.3d at 959 (quoting *Mattox*, 146 U.S. at 150, and *Remmer*, 347 U.S. at 229).  "Harmlessness in this context means that there is no reasonable possibility that the communication . . . influenced the verdict." *Id.* at 968 (citation and quotation omitted).  "If the state does not prove harmlessness, the court sets aside the verdict.  When the presumption arises but the prejudicial effect of the contact is unclear, the trial court must hold a hearing to determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial." *Id.* at 962 (quotations omitted).

The opinion remanding this matter clarifies that there are two halves to the inquiry at step one of the *Godoy* framework.  The first half of the step one inquiry is to discern "the type of contact at issue." *Clark*, 936 F.3d at 970.  This is required because of the "practical impossibility of shielding jurors from all contact with the outside world" and because not all "contacts risk influencing the verdict[.]" *Godoy*, 861 F.3d at 967 (internal quotations and citations omitted).  It is only "'*sufficiently improper*'" contacts that may trigger a presumption of prejudice. *Clark*, 936 F.3d at 970 (quoting *Godoy*, 861 F.3d at 967) (emphasis in *Clark*).  This first part of the step one inquiry is intended to identify and exclude "prosaic" forms of misconduct, such as jurors' "chance contacts" with witnesses while passing in hallways or crowded on elevators, because allegations of such contact are only "[t]hreadbare or speculative" on the question of prejudice. *Id.* (quotations omitted).

"Once the contact has been determined to be sufficiently improper, the court moves on to the second half of the first step: determining whether the sufficiently improper contact gives rise to a credible risk of affecting the outcome of the case." *Clark*, 936 F.3d at 970 (quotation and citation omitted).  Although the defendant's burden here "is not onerous," *Godoy*, 861 F.3d at 968, not all "sufficiently improper" contacts will give rise to a credible risk of prejudice.  Even "highly troubling contacts do not *necessarily* raise a presumption of prejudice." *Id.* at 967 (emphasis in *Godoy*).  For this reason, a reviewing court is charged with closely examining the circumstances of the improper contact in order to determine whether an improper contact was ultimately innocuous. *Id.* at 967-68.

*Godoy* highlights some of the circumstances a reviewing court should consider, including,

in particular, "the identity of the outside party and the nature of the contact." 861 F.3d at 967. For instance, "improper" and "undue" contacts with "government officers," especially those involved in the case before the jurors, are likely to trigger the presumption, as are communications about the matter before the jury. *Id.* (citations omitted). Additional factors when considering whether a contact raises a credible risk of prejudice include "the length and nature of the contact, . . . evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction." *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 697-98 (9th Cir. 2004). Ultimately, "[t]aking the surrounding circumstances into consideration, when the juror's improper communication with a non-juror interferes with the juror's role as a juror, it raises a credible risk of affecting the outcome." *Clark*, 936 F.3d at 971, *as amended by* 948 F.3d 1172 (9th Cir. 2020) (denying rehearing). Where the defendant meets the low burden of showing such interference, then the presumption of prejudice attaches. *Id.*

Once the presumption is triggered, at step two of the *Mattox-Remmer* framework the state must rebut such presumption by introducing "contrary evidence" showing that the contact was harmless. *Godoy*, 861 F.3d at 965. It is not sufficient to merely draw contrary inferences from the same evidentiary source—for example, a juror's declaration—giving rise to the presumption of prejudice. *Id.* Where there is insufficient information in the record to determine the circumstances of the alleged contact or whether it was harmless, a court is required to hold a hearing with both parties participating at which the state must demonstrate that there is no reasonable possibility that contact influenced the verdict. *Id.* at 966. "The form of this hearing may vary, depending on what is necessary to determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial[.]" *Id.* at 969 (quotation omitted). "If the state fails to demonstrate the contact was harmless, the defendant's conviction is unconstitutional." *Id.*

## II.     The parties' evidentiary submissions.

Apart from the trial court record here, the "facts" to be considered in applying *Godoy* are derived from the competing declarations the parties submitted while contesting this claim in prior state and federal proceedings. In pertinent part, Barnes declared in November 1996 as follows:

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

During the guilt phase of trial, it became clear that the special circumstances would be found to be true and that there would be a penalty phase. I consulted with a minister about the propriety of imposing the death penalty. I explained to him my role in the trial and the facts of the case. He told me that in these circumstances the death sentence would be appropriate because the Bible says, "an eye for an eye." The minister's advice was useful. I had long believed that anyone who is guilty of murder and convicted with a special circumstance should be given the death penalty.

Barnes Decl. ¶ 6, Dkt. No. 519-2.

After visiting Barnes along with counsel for the State, Investigator Wong declared as follows:

On August 4, 1997, [counsel] and I interviewed Mr. Barnes at his residence in San Jose, California. Mr. Barnes was asked about that part of his declaration which states that he consulted with a minister during the guilt phase. The declaration states that Mr. Barnes explained to the minister his "role in the trial and the facts of the case."

Mr. Barnes told [counsel] and myself that he had asked the minister how the minister felt about the death penalty issue. The minister replied that the Bible says "an eye for an eye" and said he did not question the death penalty. Mr. Barnes also said that the minister's statement did not settle the issue; the evidence in the case was the main thing that made Mr. Barnes decide on the death penalty.

Mr. Barnes told us that he had not discussed the evidence from the trial with his minister. When the declaration was presented to him by Clark's agents he had missed that part which refers to "the facts of the case." Also, Mr. Barnes said that the talk with the minister came not during the guilt phase but around the time the penalty phase was about to start.

Wong Decl. at 3, Dkt. No. 579-1.

To counter the Wong declaration, Clark offered the declaration of Jeffrey Kim, the investigator who obtained the Barnes declaration. Regarding the circumstances of his interview with Barnes and execution of the declaration, Kim declared as follows:

In that interview, Mr. Barnes described how he consulted with his minister about the case. He stated that he had reviewed the facts of the case with his minister, and that his minister had assured him that rendering a death sentence would be appropriate. He considered this advice to be valuable in his decision.

After the interview, Mr. Barnes was informed that I would return with a declaration based upon the interview and that he would have a chance to discuss it, or make any necessary changes. I returned with another investigator and presented him with a declaration for his review. It was a short declaration, yet he spent a great deal of time going over the declaration and every detail in it. He even made some changes.

Kim Decl. ¶¶ 3-4, Dkt. No. 524-4.

8

1    **III.    The parties' evidentiary disputes.**

2          As observed by the court of appeals, longstanding objections to the admissibility of some

3    of the evidence set forth above—including, in particular, the Wong declaration—have never been

4    adjudicated.  *Clark*, 936 F.3d at 964 n.1.  The court of appeals likewise declined to resolve any

5    evidentiary disputes.  *Id.* at 972.  Clark argues that the Wong declaration is inadmissible hearsay

6    and further asserts that, to the extent any admission of misconduct on Barnes's part might suffice

7    as an exception to the rule barring hearsay, "the self-serving effort to retract his previous

8    admission that he discussed the facts of the case is not.  Neither are the remainder of the

9    statements by Barnes in Mr. Wong's declaration concerning Barnes's interactions with the

10   minister or the defense investigators, including having 'missed' the portion of the declaration

11   regarding discussing the facts with his minister."  Dkt. No. 579 at 11.

12         For reasons further explained below, it is unnecessary at this time to resolve Clark's

13   hearsay challenge to the Wong declaration.  I conclude that the Wong declaration would not

14   compel a different result from that outlined in this order even if I assumed admissibility.

15         The parties have also objected to discrete portions of the Barnes and Wong declarations

16   based upon the no-impeachment rule codified in Rule 606(b)(1), which prohibits a juror's

17   testimony "[d]uring an inquiry into the validity of a verdict or indictment," "about any statement

18   made or incident that occurred during the jury's deliberations; the effect of anything on that juror's

19   or another juror's vote; or any juror's mental processes concerning the verdict or indictment."

20   Specifically, respondent asserts that Barnes's statement that he found his minister's advice

21   "useful" is inadmissible under this rule.  Dkt. No. 583 at 6 n.3.  Likewise, Clark argues that

22   Wong's statement that Barnes told him that the minister's advice did not settle the issue and that

23   the evidence was the primary reason for his vote is "problematic" because it "describes the

24   thought processes in deliberating and rendering a verdict."  Dkt. No. 579 at 11.

25         There are two relevant exceptions to the no-impeachment rule: a juror may testify about

26   whether "extraneous prejudicial information was improperly brought to the jury's attention" or

27   whether "an outside influence was improperly brought to bear on any juror[.]"  Fed. R. Evid.

28   606(b)(2)(A) & (B).  Applying these exceptions, the court of appeals has "deemed admissible

United States District Court
Northern District of California

limited juror testimony to determine the impact [of an outside influence] upon the juror, and whether or not [the outside influence] was prejudicial." *Tarango v. McDaniel*, 837 F.3d 936, 951 (9th Cir. 2016) (quotation omitted).  Accordingly, juror testimony is not limited to the mere existence of an external contact. *Id.*  "Rather, a court should [also] consider the effect of extraneous information or improper contacts on a juror's state of mind, a juror's general fear and anxiety following such an incident, and any other thoughts a juror might have about the contacts or conduct at issue." *Id.* (citations and quotations omitted).  While the Rule's exceptions "permit[] the introduction of limited evidence of a juror's state of mind to prove juror misconduct[,]" a juror may not testify "regarding the affected juror's mental processes in reaching the verdict." *Id.* (emphasis omitted) (citation and quotations omitted).

Applying these principles in *Tarango*, the court of appeals both admitted and excluded a juror's various statements concerning his external contacts with police during trial.  The juror was permitted to testify about how a police tail occurring on his drive to the courthouse one day "impacted him" but not about "how it impacted his deliberations and verdict." *Id.* at 951.  For example, the juror's statement that he found the tail "unnerving" was admissible, but his statements that he voted under duress and continued to have doubt after the verdict were inadmissible. *Id.*

Courts have expressed frustration in applying Rule 606(b) and its exceptions. *See, e.g., Barnes v. Thomas*, 938 F.3d 526, 534 (4th Cir. 2019) ("Rule 606 thus presents unique difficulties in the context of juror misconduct claims. . . .  For example, Barnes was tasked with proving that [a juror's] conduct affected the jury's decision, but he was prohibited from directly asking any of the jurors about this effect.  This paradox led to confusion during the evidentiary hearing and lengthy colloquies between the parties and the magistrate judge as to the propriety of certain lines of questioning.").  The parties' arguments here respecting the targeted portions of the Barnes and Wong declarations illustrate the tension between the rule and its exceptions discussed in *Barnes*.  Barnes (the juror) stated that his minister's advice about the death penalty was "useful."  Given the overall context of the Barnes declaration, this statement is admissible as evidence of the impact of Barnes's contact with his minister on his state of mind; it is not an improper statement of his

1    "mental processes in reaching the verdict." *Tarango*, 837 F.3d at 951.  Even if the statement were

2    inadmissible under Rule 606(b), I find that it is not necessary to sustain this order's ultimate

3    conclusions under the *Mattox-Remmer* framework because Clark's showing of potential harm is

4    not appreciably diminished absent the statement.

5           *Barnes* is instructive on how the available evidence should be interpreted: "Given how

6    Rule 606 limits presentation of evidence in these circumstances, it is especially important for us to

7    view the record practically and holistically when considering the effect that a juror's misconduct

8    'reasonably may be taken to have had upon a jury's decision.'"  938 F.3d at 534 (quoting

9    *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)).  Viewing the record "practically and

10   holistically" in this case, one can infer that Barnes found his minister's advice "useful" regardless

11   of whether he expressed that sentiment in his declaration.  He sought his minister's advice on a

12   profound moral question at the exact moment that he contemplated he would have to make the

13   judgment whether to impose life or death.  As *Godoy* and other cases have recognized, who the

14   juror contacted matters.  *See* 861 F.3d at 967.  If Barnes had sought his neighbor's opinion about

15   "the propriety of imposing the death penalty," that would present a different question.  That

16   Barnes sought out his minister's opinion at the time and for the reasons that he did weighs

17   substantially in assessing prejudice because of the implications it raises, regardless of whether

18   Barnes saying that it was "useful" is admissible.  *See Barnes*, 938 F.3d at 535.

19          Clark's argument that the targeted portions of the Wong declaration are inadmissible under

20   Rule 606(b) is also persuasive.  Wong recounts Barnes's specific, unsworn representation that he

21   prioritized the evidence over his minister's advice when deliberating and rendering his verdict.

22   This appears to constitute testimony about a juror's "mental processes in reaching the verdict."

23   *Tarango*, 837 F.3d at 951.  For reasons further explained below, I do not give Wong's declaration

24   great weight; but even if this portion of the Wong declaration is admissible, it would not compel a

25   different result from that reached in this order.

26          In sum, it is unnecessary at this time to conclusively resolve any evidentiary disputes.  My

27   findings are based upon the plainly admissible or unchallenged portions of the declarations

28   submitted by the parties.  My findings would not be altered by the admission or exclusion of any

United States District Court
Northern District of California

challenged item of evidence raised by either party.

## IV.     The parties' arguments on remand.

On remand, respondent concedes that Barnes's consultation with his minister is misconduct that is presumptively prejudicial under *Godoy*.  Dkt. No. 583 at 3-4.  Respondent maintains, however, that other evidence in the record rebuts the presumption of prejudice and demonstrates that Barnes's misconduct was harmless.  *Id.* at 4-8.  Respondent also contends that, given the content of the Barnes declaration, the presumption of prejudice attaches only to the jury's penalty phase verdict.  *Id.* at 8-9.  Clark, on the other hand, asserts that the presumption is not rebutted by the record, that respondent cannot rebut the presumption because Barnes's misconduct was objectively harmful, and that the prejudice attached at the guilt phase of his trial, thereby invalidating his conviction and sentence.  Dkt. No. 589 at 6-11.  Accordingly, the briefing on remand presents inquiries at both steps of *Godoy*'s articulation of the *Mattox-Remmer* framework, i.e., whether the presumption of prejudice has attached (to the guilt phase verdict) and whether any presumptively prejudicial contact ultimately was harmless.

## V.     Application.

### A.     The record does not establish presumptive guilt phase prejudice.

Clark argues that the presumption of prejudice attached at the guilt phase of his trial because, according to the Barnes declaration, the contact happened prior to the jury's guilt phase verdict.  He also argues that, because the minister supposedly "advocated death in this case," the contact prejudiced the juror's guilty verdict and the required special circumstance findings since those votes were necessary to advance to the penalty phase.  Dkt. No. 579 at 10.  Respondent asserts that the Barnes declaration demonstrates that the juror's conversation "was limited to the issue of penalty," and that any discussion of the "facts" adduced during the guilt phase was only to provide "context for the penalty question."  Dkt. No. 583 at 8.

It is uncontested that Barnes's contact with his minister was improper.  He approached a non-juror he no doubt esteemed as a moral authority and, in contravention of his instructions as a juror, discussed the case and sought his minister's opinion on a question he believed would eventually be put to the jury.  This was not "prosaic" misconduct or an unfortunate chance

encounter that had the unintended effect of placing Barnes in a "'potentially compromising situation.'"  *Clark*, 936 F.3d at 970 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).  It was conscious misconduct by a juror designed to solicit extraneous opinion related to the juror's function.  I conclude that Barnes's contact was "sufficiently improper" to proceed to the second part of *Godoy*'s step one inquiry—whether the contact gave rise to a credible risk of affecting the outcome of the guilt phase.  *Id.*

It is here, where the surrounding circumstances of the contact are paramount, that Clark's claim of guilt phase prejudice falters.  *Godoy* is not a capital case, and its articulation of the *Mattox-Remmer* framework does not apply seamlessly in the context of modern capital trials, in which there are two distinct phases of trial with two distinct jury verdicts.  This imperfect fit is amplified when considering how the jury's function in these two phases differs.  At the guilt phase, the jury renders the traditional guilty or not guilty verdict, along with special circumstance findings in California, based upon its fact-finding subject to the provided legal instructions.  By contrast, in the penalty phase the jury is tasked with a wholly separate and subjective moral judgment: whether aggravating circumstances "outweigh" mitigating circumstances such that the defendant should be sentenced to death.  *See, e.g., People v. Edelbacher*, 47 Cal.3d 983, 1037 (1989) ("In explaining the jury's role at the penalty phase, we have stated that the jury exercises an essentially normative task, acting as the community's representative, that it may apply its own moral standards to the aggravating and mitigating evidence presented, and that it has the ultimate responsibility for determining if death is the appropriate penalty for the particular offense and offender.").  Given this fundamental difference in the jury's function in rendering its two verdicts, and considering the context dependent inquiry required by *Godoy*, it follows that, given its particulars, a contact may pose an intolerable risk of prejudice to the jury's verdict in one phase of a capital trial while not posing an equivalent, or even appreciable, risk to the jury's verdict in the other phase.

Clark cites no authority supporting his proposition that an extrajudicial juror contact may be presumptively prejudicial because of its temporal relation to a particular phase of a capital trial.  Where a jury renders only one verdict, there is no issue regarding the temporal relation of a juror's

1    extrajudicial contact and the jury's verdict.  But where a jury in a capital trial participates in

2    essentially two bifurcated trials and renders two verdicts of such distinct character, the

3    coincidental timing of the contact is of less import than its substance.  As *Godoy* commands, the

4    surrounding circumstances of the contact, of which timing may be one factor, control this part of

5    the inquiry.

6           Both the identity of Barnes's outside contact and the subject matter of the contact render

7    Clark's argument about guilt phase prejudice highly attenuated.  Barnes declared that during the

8    guilt phase it became clear to him that Clark would be found guilty and that the charged special

9    circumstances would be found true.  Because he believed a penalty phase was inevitable, and

10   inferentially harbored some doubt about the moral or spiritual justifications of the death penalty,

11   he consulted with his minister "about the propriety of imposing the death penalty."  In other

12   words, he solicited the opinion of a moral authority on the uniquely moral and subjective

13   judgment he believed he would be required to provide in the penalty phase.  Given the difference

14   in guilt and penalty phase jury functions discussed previously, it is evident that a religious

15   authority's opinion on a moral or spiritual question like the "propriety of imposing the death

16   penalty" is especially likely to interfere with or influence a juror's verdict at the penalty phase.

17   Concomitantly, such an opinion would bear no obvious relevance to the question of whether the

18   state has proved sufficient facts to support its charges at the guilt phase.

19          While Barnes admittedly claims to have discussed the "facts" revealed by guilt phase

20   evidence, the declaration suggests nothing more than that he did so to provide his minister context

21   to inform the minister's opinion on the question Barnes presented him.  Read naturally, Barnes's

22   declaration indicates that he approached his minister seeking a sort of preemptive absolution for

23   rendering the moral judgment—to impose a death sentence—that he believed he would have to

24   make based upon the evidence he had seen to that point.  Barnes's minister was not involved in the

25   trial and he is not purported to be an expert or authority on any disputed question that was before

26   the jury at the guilt phase.  There is no inferable fact about which Barnes sought or received his

27   minister's opinion concerning whether a fact germane to the guilt or innocence or special

28   circumstance inquiries had been proved.  Nor is there any evidence that Barnes's minister's advice

1    about the propriety of the death penalty otherwise impacted Barnes's decision at the guilt phase of

2    trial.  *Caliendo*, 365 F.3d at 697-98 ("evidence of actual impact on the juror" is relevant in

3    assessing the risk of prejudice).  There is no reason to believe that Barnes felt compelled to convict

4    Clark and find true the charged special circumstances merely to effectuate his minister's supposed

5    advocacy for capital punishment rather than because of the evidence adduced during the guilt

6    phase.  The declaration makes clear that, because he believed that the guilt and special

7    circumstance findings were inevitable, he decided to solicit his minister's opinion on the question

8    that would be presented in the penalty phase.

9         Of course, Barnes's contact with his minister was improper and, even regarding the juror's

10   guilt phase verdict, troubling.  But even "highly troubling contacts do not *necessarily* raise a

11   presumption of prejudice."  *Godoy*, 861 F.3d at 967 (emphasis in *Godoy*).  Taking account of all

12   the circumstances surrounding the contact, it is difficult to conceive how Barnes's minister's

13   advice about biblical support for the death penalty could have posed a credible risk to Barnes's

14   guilt phase verdict.  Accordingly, on the present record, I find that Barnes's contact with his

15   minister did not interfere with his function as a juror at the guilt phase of trial.  *Clark*, 936 F.3d at

16   971.

17        **B.     Presumptive penalty phase prejudice is not rebutted.**

18        While respondent concedes that Barnes's contact with his minister is presumptively

19   prejudicial at step one of the *Mattox-Remmer* framework regarding the jury's penalty phase

20   verdict, he contends that the Barnes declaration and other evidence in the record rebut the

21   presumption and show that Barnes's misconduct was harmless.  Dkt. No. 583 at 3-4.  Respondent

22   bases this argument on his assertions that this case is distinguishable from *Godoy*, that Barnes's

23   declaration both raises and rebuts the presumption of prejudice, and that Barnes's testimony

24   during voir dire further demonstrates that his subsequent misconduct was harmless.  For the

25   following reasons, I disagree.

26        Respondent's distinctions of *Godoy* are not material.  Respondent first argues that "*Godoy*

27   involved a number of conversations throughout the trial whereas here there was only one

28   conversation."  Dkt. No. 583 at 4.  While it is true that *Godoy* involved a juror's repeated text

United States District Court
Northern District of California

15

messaging with her "judge friend" during trial, nothing in *Godoy*, or *Mattox* or *Remmer* for that matter, imposes any sort of numerosity requirement on the improper juror contact in order to establish prejudice. A singular contact of a sufficiently prejudicial nature can prove harmful. *See, e.g., Barnes*, 938 F.3d at 534-36 (holding that, where, in a single conversation, "a juror improperly consulted with her pastor about whether she could vote to impose the death penalty without running afoul of her religious beliefs" and subsequently shared her pastor's opinion with other jurors, actual prejudice to the jury's sentencing verdict resulted).

Respondent also distinguishes *Godoy* because "we know more about the conversation in this case and are therefore able to make a better assessment of prejudice in the context of the record as a whole." Dkt. No. 583 at 4. Even if true, that we know more about the content of Barnes's extrajudicial conversation than was apparent in *Godoy* does not support a finding that the presumption of prejudice is rebutted. *Godoy* involved a juror's repeated improper texting of her "judge friend" concerning trial developments and procedures and the juror's sharing of the judge's responses with other jurors. 861 F.3d at 960. Due to the paucity of information about the content of the juror's improper contacts, the court of appeals could not discern whether they were harmless and therefore remanded for an evidentiary hearing. *Id.* at 970. If anything, because Barnes's declaration is succinct about why he sought his minister's advice, what was the content of their conversation, and its impact on him, it is arguable that additional record development, as was ordered in *Godoy*, is not required to judge harmlessness.

Respondent's final point in distinguishing *Godoy* is that, unlike in *Godoy*, there is no indication that Barnes shared the content of his improper extrajudicial contact with other jurors. Dkt. No. 583 at 4. In California, where a jury verdict imposing a death sentence must be unanimous, CAL. PENAL CODE § 190.4(b), prejudice may be established merely by showing undue influence on just one juror. *See, e.g., Doe v. Ayer*, 782 F.3d 425, 446 (9th Cir. 2015) (noting that, because "death sentences in California must be imposed by a unanimous jury," ineffective assistance of counsel is prejudicial "if there is a reasonable probability that at least one juror would have voted for life") (internal quotation omitted). The Barnes declaration permits the reasonable inference that Barnes's sentencing vote was influenced by his improper conversation with his

1    minister.  That Barnes may not have shared his minister's opinion with other jurors is no rebuttal

2    to the presumptively prejudicial conduct of Barnes.

3        Respondent also contends that Barnes's declaration rebuts the presumption of prejudice.

4    Respondent cites Barnes's statement that he "had long believed that anyone who is guilty of

5    murder and convicted with a special circumstance should be given the death penalty."  Dkt. No.

6    583 at 6.  But this argument is problematic for at least two reasons.  First, it strains to skirt

7    *Godoy*'s admonition that identical evidence may not be used to both raise and rebut a presumption

8    of prejudice.  Second, and more importantly, if credited, respondent's argument would deprive

9    Barnes's declaration of its most natural construction.

10        In *Godoy*, the court of appeals found that the California Court of Appeal erred in applying

11   *Remmer* because "[o]nce the state court decided that a statement in [a juror's] declaration triggered

12   the presumption of prejudice, it could not rely on the exact same statement to conclude the

13   presumption was rebutted—effectively negating the presumption."  861 F.3d at 964-65.  In other

14   words, because the state court determined that the juror's declaration describing another juror's

15   repeated communications with her "judge friend" raised the presumption of prejudice, it was error

16   for the state court to infer harmlessness because the juror's declaration did not indicate that

17   prejudicial information was exchanged and conveyed to other jurors.  *Id.*  Rather than drawing a

18   contrary inference from the same evidence that established the presumption, the state is obliged to

19   present contrary evidence to prove harmlessness.  *Id.* at 965; *id.* at 968 ("[T]he state must rebut the

20   presumption by pointing to some evidence contrary to the evidence that established it.  Drawing

21   contrary inferences from the same evidence is not enough.").

22        Respondent attempts to circumvent this prohibition by arguing that, although Barnes's

23   statement declaring his long-held belief about the propriety of the death penalty is included in the

24   same short paragraph as his statements describing his conversations with his minister, the "opinion

25   is distinct from the conversation with the minister and therefore can serve as independent evidence

26   to rebut any presumption of prejudice that might arise from the conversation."  Dkt. No. 583 at 6.

27   Respondent cites no authority for his proposition that Barnes's statement may be parsed so finely

28   notwithstanding the clear language of *Godoy*.

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1    More importantly, respondent's argument ignores the reasonable inference that Barnes's

2 conversation with his minister was not distinct from his prior opinion about the death penalty

3 because the former was pursued in service of confirming the latter.  Barnes's declaration supports

4 the reasonable inference that, as the gravity of his role in the anticipated penalty phase began to

5 weigh on him, he began to question his preconceptions about the death penalty.  After the

6 "propriety of imposing the death penalty" evolved from a purely hypothetical and abstract

7 question to a profound personal moral dilemma, his "useful" conversation with his minister freed

8 him from the doubt that likely caused him to seek out his minister's advice in the first place and

9 steeled his resolve to adhere to his prior opinion about the propriety of the death penalty.[2]  Framed

10 in this context, nothing in the Barnes declaration dispels the "reasonable possibility that the

11 communication  . . . influence[d] the verdict."  *Godoy*, 861 F.3d at 968 (quotation omitted).  Even

12 if it could do so notwithstanding *Godoy*, Barnes's declaration does not rebut the presumption of

13 prejudice that it created.

14    Respondent also argues that the presumption of prejudice is rebutted by Barnes's responses

15 during voir dire.  Respondent points to a few instances in voir dire where Barnes indicated that he

16 generally supported the death penalty and would vote for it if the evidence supported doing so,

17 that the punishment for a murder accompanied by rape should be calibrated with the "degree of

18 rape," and that the age of the victim would be significant to him in assessing a sentence.  Dkt. No.

19 583 at 7.  Considering the circumstances of the rape and murder of the teenaged victim, the

20 argument goes, it is likely that Barnes would have voted for death regardless of his minister's

21 advice.  But, as discussed above, whatever certitude Barnes might have expressed about the

22 propriety of the death penalty before he was a juror must be weighed against the evidence, from

23

---

24 [2] It is fair to wonder whether Barnes's minister's advice about the death penalty fortified his decision to
vote for death given that he apparently found compelling Clark's mitigation evidence during the penalty

25 phase.  He declared that Clark's "defense lawyers put up several witnesses that testified to the horrible
childhood Mr. Clark experienced.  After this testimony, I realized that Mr. Clark never had a chance in life

26 and was beyond rehabilitation after experiencing the pain and trauma from such an awful upbringing.  I
knew these childhood experiences damaged him an[d] that Mr. Clark would always be a dangerous

27 person."  Barnes Decl. ¶ 4.  Although this mitigation evidence apparently was introduced after Barnes
conversed with his minister, it is reasonable to infer that Barnes relied upon his minister's "useful" "eye for

28 an eye" advice about the death penalty when weighing this compelling mitigation evidence during
deliberations.

his own account, tending to show how participating in a capital trial and contemplating his role in possibly condemning a man to death affected him.  As discussed above, Barnes's declaration supports the reasonable inference that he went to his minister to assuage whatever doubt he may have had about imposing a death sentence.  *See Barnes*, 938 F.3d at 536 ("It is reasonable to conclude that, especially coming from a figure of religious authority, Pastor Lomax's message assuaged reservations about imposing the death penalty that the attorney's comments may have instilled.").  Even if his minister's opinion only reaffirmed some preexisting commitment to the death penalty, that alone makes it reasonably possible that Barnes's contact with his minister influenced the verdict, and prior expressions of that commitment cannot rebut the prejudice flowing from the subsequent improper contact with the minister.

Finally, although respondent does not appear to explicitly argue in his post-remand briefing that the Wong declaration rebuts the presumption of prejudice, respondent refers to the declaration and quotes from its relevant portions in his statement of the procedural history of the Barnes claim.  *See* Dkt. No. 583 at 1.  Investigator Wong states in his declaration that Barnes told him that Barnes's "minister's statement did not settle the issue; the evidence in the case was the main thing that made Mr. Barnes decide on the death penalty."  Putting aside petitioner's hearsay and no-impeachment objections to the admissibility of the Wong declaration, I conclude that the Wong declaration does not demonstrate harmlessness.  As a matter of persuasion, I afford little weight to the statements undermining Barnes's prior attestations because, for whatever reason, Wong was unable to procure a subsequent declaration from Barnes stating, in his own sworn testimony, why his earlier attestations were not accurate.  Barnes's sworn testimony is simply better evidence of his state of mind following his contact with his minister.

And even admitting and crediting the Wong declaration, it is reasonable to infer that Barnes's contact with his minister still had some influence on his verdict.  In Barnes's own statement, his minister's advice was "useful," while, according to Wong, the minister's advice "did not settle the issue" and the "evidence in the case was the main thing" that Barnes considered when deciding on the death penalty.  Where the question is merely whether there is a reasonable possibility that the improper contact influenced the verdict, Wong's declaration that the minister's

19

advice was not determinative and that the evidence was the primary consideration does not mark a dramatic departure from the impact attributed by Barnes in his own words.  The "useful" advice Barnes obtained from his minister reasonably could have influenced his verdict even if it did not settle the issue for him and was subordinate to the evidence introduced at trial.  Respondent has cited no authority dictating a contrary conclusion.

> **C.**   **Whether further record development is necessary or even possible.**

*Godoy* instructs that, once the presumption of prejudice attaches, a reviewing court must hold a hearing "if there is any remaining uncertainty about what actually transpired, or whether the incidents that may have occurred were harmful or harmless."  861 F.3d at 969 (quotation omitted).  The object of the hearing is to "determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial[.]"  *Id.* (quotation omitted).

As described previously, on the current record there is little room for doubt about what transpired.  Although brief, Barnes's declaration speaks clearly and compellingly about why he sought his minister's advice, what the content of his conversation with his minister was, and the effect the contact with his minister had on him.  Nothing respondent has offered in rebuttal, including the Wong declaration, materially detracts from the core points establishing presumptive prejudice to Barnes's penalty phase verdict.  This record is sufficient to conclude that the acknowledged constitutional error was not harmless and that Clark is entitled to habeas corpus relief regarding his death sentence.

To be sure, much of the import of the Barnes declaration is inferred.  I infer that Barnes harbored some spiritual or moral doubt about the "propriety of imposing the death penalty" because he sought his minister's opinion on that question at the moment he contemplated he would be tasked with making that decision.  I further infer that the minister's advice assuaged any doubt Barnes may have retained or developed about the death penalty because of the minister's status as a moral and spiritual authority uniquely positioned to offer advice about the "propriety of imposing the death penalty."  Assuming its admissibility as a statement showing the impact of his contact with his minister, Barnes's testimony that his minister's advice was "useful" confirms this inference.

1    To the extent there remains any lingering question about what happened, its impact on

2  Barnes, or whether it was harmless, it is unclear how a hearing would advance such inquiries.

3  *Godoy* proposes several "illustrative" examples of how the state might rebut a presumption of

4  prejudice, including "seek[ing] evidence from the jurors themselves . . . or from the outside party

5  who had contact with the jury[,]" "find[ing] contrary evidence elsewhere in the existing record

6  that sheds new light on the potentially prejudicial communication[,]" or "seek[ing] further

7  evidence about the content of the communications themselves[.]" 861 F.3d at 968-69. Barnes is

8  now deceased. *See* Dkt. No. 583 at 8. Respondent's options to develop and present additional

9  relevant facts along these lines appear limited. No party has indicated that the "outside party who

10  had contact" with Barnes—the minister—is available to testify. For the reasons already stated, a

11  hearing in which Investigator Wong or Mr. Kim merely testify consistently with their declarations

12  would not materially alter the evidentiary picture. It is also reasonable to question the procedural

13  fairness of finally opening the courtroom doors for a hearing after Clark's twenty-five year effort

14  to obtain a hearing on this claim, where the hearing ostensibly would be limited, under *Godoy*, to

15  resolving whether respondent can present evidence showing that Barnes's misconduct was

16  harmless.

17    Notwithstanding these concerns, both parties have asserted that an evidentiary hearing

18  might be useful. Clark argues that "the Court should grant the *Remmer* hearing to the extent [he]

19  has failed to establish the 'low threshold' of the possibility of prejudice that *Godoy* requires[,]"

20  Dkt. No. 579 at 13, while respondent submits that "[s]hould this court determine that a decision

21  cannot be made on the basis of the record alone then further exploration of the possibility of

22  available witnesses and potential evidentiary issues can be undertaken." Dkt. No. 583 at 8. I have

23  reservations on both points. While I find that Clark has not yet established a credible risk of guilt

24  phase prejudice, it does not appear that *Godoy* contemplates affording an evidentiary hearing at

25  step one of the *Mattox-Remmer* framework to facilitate such a threshold showing. Regarding

26  respondent's contention, as described previously, I conclude that the record is sufficient to support

27  a finding of harmful error regarding the jury's penalty phase verdict and I am deeply skeptical that

28  an evidentiary hearing could materially alter the evidentiary support for this conclusion.

United States District Court
Northern District of California

1    That said, I am open to the possibility of productive factual development so that this

2    important claim, which illustrates plain and serious juror misconduct, may finally receive a full

3    airing to the extent such is possible at this late date.  As an equitable matter, any hearing afforded

4    will not be limited in scope to an inquiry on whether respondent can show that the presumptively

5    prejudicial error described in this order was harmless regarding the penalty phase.  If Clark can

6    produce evidence probative of guilt phase prejudice beyond that which he has already submitted,

7    then, provided its admissibility, I will consider whether such evidence establishes presumptively

8    prejudicial error concerning the jury's guilt phase verdict.

9    Accordingly, given the findings reflected in this order, I will direct the parties to submit

10   briefing addressing whether an evidentiary hearing is necessary and, if so, the specific evidence

11   each party would seek to introduce at such hearing.

### CONCLUSION

13   For the foregoing reasons, I ORDER that the parties file briefs on the necessity and

14   efficacy of any evidentiary hearing or further factual development in this matter.  If a party

15   proposes that an evidentiary hearing is in order, the party shall provide, with specific detail, the

16   evidence the party would seek to introduce at such hearing.  If a party concludes that no

17   evidentiary hearing is necessary or that it would be futile to convene such a hearing, then the party

18   shall so indicate in their briefing.  The parties shall file their briefs on or before June 24, 2022.

19   After due consideration, I will resolve any disputes about the necessity or efficacy of further

20   factual development and will, if appropriate, set a schedule for further factual development or,

21   alternatively, enter judgment in accordance with this order's findings.

22   **IT IS SO ORDERED.**



Dated: May 9, 2022

William H. Orrick
United States District Judge